**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 28 2012

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

L & J PLANTING, INC.                                    PLAINTIFF

VS.                        NO. 2:12cv231 BSM

RURAL COMMUNITY INSURANCE SERVICES, INC. &
FIREMAN'S FUND INSURANCE COMPANY &
FEDERAL CROP INSURANCE CORPORATION &
RISK MANAGEMENT AGENCY OF THE
UNITED STATES DEPARTMENT OF AGRICULTURE        DEFENDANTS

This case assigned to District Judge _Miller_
COMPLAINT  and to Magistrate Judge _Kay_

Comes L & J Planting, Inc., by and through its attorneys Gibson & Keith,

PLLC, and for its complaint states:

1.      This is a suit to recover damages arising from the wrongful denial of crop

insurance benefits. Jurisdiction lies in this Court pursuant to 7 U.S.C. § 1506 (d) and

28 U.S.C. §§ 1332 & 1331.

2.      Plaintiff is an Arkansas corporation registered and doing business in the

State of Arkansas.

3.      Upon information and belief, Defendant Rural Community Insurance

Services, Inc. ("RCIS" herein) is a foreign corporation with its principal place of

1

business in the state of Minnesota, but it is not registered with the Arkansas Secretary of State to do business in Arkansas. At all times relevant, RCIS was a general agent of defendant Fireman's Fund Insurance Company.

4.      Defendant Fireman's Fund Insurance Company is registered to do business as an Arkansas insurance company. At all times relevant, Defendant Fireman's Fund Insurance Company employed RCIS as its general agent.

5.      Defendant Federal Crop Insurance Corporation is a wholly owned government corporation within the United States Department of Agriculture.

6.      Defendant Risk Management Agency is a division of the United States Department of Agriculture.

7.      On or about February 1, 2005, for premiums paid to RCIS in the amount of $5,638.00 Fireman's Fund Insurance Company and RCIS issued to L & J Planting, Inc. a Multi Peril Crop Insurance Policy No. 03-090-697133 ("the Policy") relative to units 006 and 007 as identified on the Policy. A copy of the Policy is attached hereto.

8.      The Policy insured Plaintiff's rice crops that were grown in Monroe County, Arkansas in 2005 against various causes of loss, including without limitation, excessive heat during the growing season and loss caused by hurricanes during the growing season. Plaintiff's rice crops on units 006 and 007 sustained loss due to

2

excessive heat damage during the 2005 growing season.

9.     Upon being notified of the damage to the Plaintiff's rice crops due to excessive heat, RCIS inspected the said crops and appraised the loss to the crops and paid over to or for the benefit of the Plaintiff the sum of $114,712.00, after certain adjustments to which L & J Planting, Inc. agreed.  Said claims were approved by RCIS in December, 2005 and were then paid.

10.     On information and belief, Defendant Risk Management Agency (RMA) contacted RCIS on December 6, 2007 and informed RCIS that it had determined that L & J Planting, Inc. had not followed good farming practices in the production of the 2005 rice crops and that, as a consequence of same, RMA had determined that RCIS had overpaid L & J Planting, Inc. $114,712.00 in crop insurance indemnity and that the said amount would be charged back to RCIS and Fireman's Fund Insurance Company.  RCIS was given 45 days to appeal the determination by RMA, but did not do so.  RCIS did not inform L & J Planting, Inc. of its decision not to appeal the RMA determination.

11.     On or about December 21, 2007, RCIS wrote to L & J Planting, Inc. that it was demanding to be reimbursed $114,712.00 and gave L & J Planting, Inc. 30 days to request review of its decision to demand a reimbursement.  On January 15, 2008, L & J Planting, Inc. requested that RCIS review and reconsider its decision to demand

3

that L & J pay it $114,712.00.

12.     On or about June 20, 2008, RCIS sent a letter to L & J Planting, Inc. in response to the January 15, 2008 request for review and reconsideration. RCIS stated that it was standing by the decision to demand payment from L & J Planting, Inc. on the basis of the alleged failure of L & J Planting, Inc. to follow good farming practices with respect to the 2005 rice crop.

13.     On or about June 20, 2008, RCIS further directed L & J Planting, Inc. to Section 20 (d) of the Policy which provides that a request for reconsideration of a determination by the RMA or the insurer (in this case RCIS and/or Fireman's Fund) that a policyholder had not followed good farming practices was to be taken to Defendant Federal Crop Insurance Corporation as is prescribed by 7 CFR Part 400. Review by FCIC is listed in the Policy as a condition precedent to suit against Defendant Federal Crop Insurance Corporation.

14.     On July 9, 2008, L & J Planting Inc., following the procedure outlined in 7 CFR Part 400, and requested that the USDA reconsider the determination that L & J Planting, Inc. had not followed good farming practices with respect to the 2005 rice crops. Said request was received by the USDA Deputy Administrator for Insurances by certified mail on July 16, 2008 at the address prescribed in 7 CFR Part 400.

15. On August 31, 2008, L & J Planting, Inc., reiterated its request for reconsideration. Said reiteration of the request was received by the USDA Deputy Administrator for Insurances on September 8, 2008.

16. The USDA Deputy Administrator for Insurances had made no response to the requests for reconsideration of the determination that L & J Planting, Inc. did not engage in good farming practices with respect to the 2005 rice crops.

17. RCIS stated to RMA in a letter dated October 5, 2007 that it believed all adjustments to the indemnity payment which were warranted by the cultural practices observed and documented by its adjustors had been made and that the indemnity payments made in December 2005 to L & J Planting, Inc. were correct. RCIS, and its principal Fireman's Fund Insurance Company owed a duty of good faith and fair dealing to appeal the determination by RMA that L & J Planting, Inc. did not have an insurable loss due to the alleged failure to follow good farming practices.

18. As a result of the actions of the various defendants, Plaintiff has been disqualified from receiving commodity program benefits up to the amount of $114,712.00 that are essential to the success of its operations and has been disqualified from participation in the Multiperil Crop Insurance program.

19. Plaintiff followed good farming practices as required by the Policy in the production of the 2005 rice crops and Plaintiff therefore did not have an uninsurable

loss to its 2005 rice crops in the amount claimed by FCIC and RMA.

**DEMAND FOR JURY TRIAL.** Plaintiff respectfully demands a trial by jury of all issues so triable.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that it have judgment jointly and severally over and against Rural Community Insurance Services, Inc., Fireman's Fund Insurance Company, Federal Crop Insurance Corporation and Risk Management Agency for the amount of its damages, which are stated to be in excess of those sufficient for federal diversity jurisdiction, plus its attorneys fees, costs, and such other relief to which it may show itself entitled.

RESPECTFULLY SUBMITTED
L & J Planting, Inc.

BY: _____

Paul W. Keith          Ark. Bar No. 94008
GIBSON & KEITH, PLLC
119 South Main Street
P.O. Drawer 447
Monticello, AR 71657
870 367 2438
870 367 8306 fax
pwk@gibsonandkeith.com

RURAL COMMUNITY INSURANCE COMPANY
01.00

**Rural Community Insurance Services**
P.O. Box 38
Anoka, MN 55303-0038

**2005 SCHEDULE OF INSURANCE / PRODUCTION REPORT**

POLICY NO: **2005 AR-090-697133**    **L & J PLANTING INC**

STATE: **03 ARKANSAS**    COUNTY: **095 MONROE**

| CROP | LEVEL | EXP | ASSIGNMENT OF INDEMNITY WITH | TOTAL ACRES/QTY | ADMIN |
|------|-------|-----|------------------------------|-----------------|-------|
| CORN | 70 | 1.000 | BANK OF BRINKLEY | .00 | |
| RICE | 70 | 1.000 | BANK OF BRINKLEY | 960.80 | $30. |
| SBEAN | 70 | 1.000 | BANK OF BRINKLEY | 99.40 | $30. |

### INSURED INFORMATION

L & J PLANTING INC
110 HWY 238
BRINKLEY, AR `72021

(870)734-3659
EIN: XX-XXX8330

### AGENT/AGENCY INFORMATION

RICE GROWERS INS AGENCY
MICHAEL LYNN WALKER        03-3003 01
114 S NEW ORLEANS
BRINKLEY, AR  72021

(870)734-4700

"I certify that the information I have furnished as reflected on this form is complete and accurate for the commodity(ies), unit(s) and year(s) shown. I understand this form may be reviewed or audited and that information inaccurately reported or failure to retain records to support information on this form, may result in a recomputation of the approved APH yield. I also understand that failure to report completely and accurately may result in voidance of my crop insurance contract and may result in criminal or civil false claims penalties (18 U.S.C. 1006 and 1014; 7 U.S.C. 1506; 31 U.S.C. 3729, and 3730)."

REMARKS:                                        DATE PRINTED 2/22/

INSURED'S SIGNATURE _____  DATE _____
(SIGN AND RETURN ONLY IF REPORTING YOUR CROP PRODUCTION)

Land in Other County  ☐Yes ☐No   Required:  ☐Field Review ☐Inspection

Processor No./Name and/or No. Trees/Vines:

| CROP PLAN | OPTIONS | TYPE PRAC | UNIT | FSN | FARM NAME COUNTY LEGAL DESC | ACRES/QTY | SHARE SHAREHOLDER | PLANT DATE | RATE CLS | GUAR PER ACRE PRICE | TOTAL GUARANTEE LIABILITY | PREMIUM | PRODUCTION 100% SHARE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CORN RA | 47 | | 000-00 | | 095 | .00 | .000 | | | | | | |
| RICE RA | 47 | IRRGT | 002-00 | 297 | 095 04-001N-002W | 189.50 | .500 D & D FARMS | 04/16/05 | | $234.61 $.0720 | $44459 $22230 | $855B | |
| RICE M RA | 47 | IRRGT | 002-00 | 426 | 095 04-001N-002W | 149.70 | .500 D&D FARMS | 04/15/05 | | $266.16 $.0720 | $39844 $19922 | $679B | |
| RICE RA | 47 | IRRGT | 006-00 | 2918 | 095 26-001S-001W | 596.40 | 1.000 | 05/17/05 | | $273.32 $.0720 | $163008 $163008 | $5409B | |
| RICE RA | 47 | IRRGT | 007-00 | 2471 | 095 22-001S-001W | 25.20 | 1.000 | 05/05/05 | | $266.16 $.0720 | $6707 $6707 | $229B | |
| SBEAN CRC | 47 | NIRR | 002-01 | 297 | 095 04-001N-002W | 79.40 | .666 D&D FARMS | 04/20/05 | | 12.6 $5.5300 | 1000  BU $3683 | $588B | |
| SBEAN CRC | 47 | IRRGT | 003-00 | 2918 | 095 26-001S-001W | 20.00 | 1.000 | 06/15/05 | | 18.9 $5.5300 | 378  BU $2090 | $184B | |

DISCLAIMER:                                    Subsidy of
THIS IS NOT A BILL.  PO Box 38, Anoka, MN  55303-0038.  An actual bill will be sent later.  However, if you would like to pay your premium, mail to:
The information contained on this schedule is considered binding.  Any errors or discrepancies must be reported to your agent immediately.  All revisions are subject to company approval.

$15497.00
Provided by FCIC

| | |
|---|---|
| FARMER PREMIUM | $7944.00 |
| FCIC ADMIN FEE | $60.00 |
| PREVIOUS CREDIT | $8204.00 |
| INTEREST | $200.00 |
| TOTAL | $.00 |

B Basic Unit Discount  EU Enterprise Unit  OU Optional Units-NRFGC  PR Premium Reduction on First Crop  UI Uninsurable  C Cuped  F Floored
P3 Late Plant/Max Reduction  RP Revised Premium after Premium Reduction  UR Uninsurable-Unreported  E Effective Date  M Modified/Corrected
PP Prevented Plant  R  Revised  S Short Rated  SC Second Crop  IW Uninsurable-Insurance Waived  WU Whole Farm Unit
* Total Guarantee based on 100% Share/ Liability based on actual share
** Record Type: 1) Production Sold/Commercial Storage; 2) On Farm Storage, Recorded Bin Measurement;
3) Inventory (Computed Bin Rate); 5) Appraisals; 6) Other
*** BU by plant type selected, coverage levels may vary by type.

# REVENUE ASSURANCE INSURANCE POLICY

This insurance policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the authority of section 508(h) of the Federal Crop Insurance Act (Act), as amended (7 U.S.C. 1508(h)). All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act. The provisions of the policy may not be waived or varied in any way by us, our insurance agent or any other contractor or employee of ours or any employee of USDA unless the policy specifically authorizes a waiver or modification by written agreement. We will use the procedures (handbooks, manuals, memoranda and bulletins), as issued by FCIC and published on the RMA website at http://www.rma.usda.gov/ or a successor website, in the administration of this policy, including the adjustment of any loss or claim submitted hereunder. In the event that we cannot pay your loss because we are insolvent or are otherwise unable to perform our duties under our reinsurance agreement with FCIC, your claim will be settled in accordance with the provisions of this policy and FCIC will be responsible for any amounts owed. No state guarantee fund will be liable for your loss.

Throughout the policy, "you" and "your" refer to the named insured shown on the accepted application and "we," "us," and "our" refer to the insurance company providing insurance. Unless the context indicates otherwise, use of the plural form of a word includes the singular and use of the singular form of the word includes the plural.

> AGREEMENT TO INSURE: In return for the payment of the premium, and subject to all of the provisions of this policy, we agree with you to provide the insurance as stated in this policy. If there is a conflict between the Act, the regulations published at 7 CFR chapter IV, and the procedures as issued by FCIC, the order of priority is as follows: (1) the Act; (2) the regulations; and (3) the procedures as issued by FCIC, with (1) controlling (2), etc. If there is a conflict between the policy provisions and the administrative regulations published at 7 CFR part 400, the policy provisions control. If a conflict exists among the policy provisions, the order of priority is: (1) the Catastrophic Risk Protection Endorsement, as applicable; (2) the Special Provisions; (3) the Crop Provisions; and (4) these Basic Provisions, with (1) controlling (2), etc.

## BASIC PROVISIONS
## TERMS AND CONDITIONS

1. **Definitions**

**Abandon** - Failure to continue to care for the crop, providing care so insignificant as to provide no benefit to the crop, or failure to harvest in a timely manner, unless an insured cause of loss prevents you from properly caring for or harvesting the crop or causes damage to it to the extent that most producers of the crop on acreage with similar characteristics in the area would not normally further care for or harvest it.

**Acreage report** - A report required by section 7 of these Basic Provisions that contains, in addition to other required information, your report of your share of all acreage of an insured crop in the county, whether insurable or not insurable.

**Acreage reporting date** - The date contained in the Special Provisions or as provided in section 7 by which you are required to submit your acreage report.

**Act** - The Federal Crop Insurance Act (7 U.S.C. 1501 *et seq.*).

**Actual Production History (APH)** - A process used to determine production guarantees in accordance with 7 CFR part 400, subpart (G).

**Actual Yield** - The yield per acre for a crop year calculated from the production records or claims for indemnities. The actual yield is determined by dividing total production (which includes harvested and appraised production) by planted acres.

**Actuarial documents** - The material for the crop year which is available for public inspection in your agent's office and published on RMA's website at http://www.rma.usda.gov/ or a successor website, and which shows available coverage levels, information needed to determine amounts of insurance, premium rates, premium adjustment percentages, practices, particular types or varieties of the insurable crop, insurable acreage, and other related information regarding crop insurance in the county.

**Administrative fee** - An amount you must pay for coverage for each crop year as specified in section 8.

**Agricultural commodity** - Any crop or other commodity produced, regardless of whether or not it is insurable.

**Agricultural experts** - Persons who are employed by the Cooperative State Research, Education and Extension Service or the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific crop or practice for which such expertise is sought.

**Annual crop** - An agricultural commodity that normally must be planted each year.

**Application** - The form required to be completed by you and accepted by us before insurance coverage will commence. This form must be completed and filed in your agent's office not later than the sales closing date of the initial insurance year for each crop for which insurance coverage is requested. If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us, or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop. Insurance coverage will not be provided if you are ineligible under the contract or under any Federal statute or regulation.

**Approved yield** - The actual production history (APH) yield calculated and approved by the verifier, used to determine the revenue guarantee by summing the yearly actual, assigned, adjusted or unadjusted transitional yields and dividing the sum by the number of yields contained in the database, which will always contain at least four yields. The database may contain up to 10 consecutive crop years of actual or assigned yields. The approved yield may have yield adjustments elected under section 36, revisions according to section 4, or other limitations according to FCIC approved procedures applied when calculating the approved yield.

**Exhibit to Complaint Page 2**

**Area** - Land surrounding the insured acreage with geographic characteristics, topography, soil types and climatic conditions similar to the insured acreage.

**Assignment of indemnity** - A transfer of policy rights, made on our form, and effective when approved by us. It is the arrangement whereby you assign your right to an indemnity payment to any party of your choice for the crop year.

**Average yield** - The yield, calculated by summing the yearly actual, assigned, adjusted or unadjusted transitional yields and dividing the sum by the number of yields contained in the database, prior to any adjustments, including those elected under section 36, revisions according to section 4, or other limitations according to FCIC approved procedures.

**Base premium rate** - The premium rate, contained in the actuarial documents, for the risk of a revenue loss.

**Buffer zone** - A parcel of land, as designated in your organic plan, that separates agricultural commodities grown under organic practices from agricultural commodities grown under non-organic practices, and used to minimize the possibility of unintended contact by prohibited substances or organisms.

**Cancellation date** - The calendar date specified in the Crop Provisions on which coverage for the crop will automatically renew unless canceled in writing by either you or us, or terminated in accordance with the policy terms.

**Certified organic acreage** - Acreage in the certified organic farming operation that has been certified by a certifying agent as conforming to organic standards in accordance with 7 CFR part 205.

**Certifying agent** - A private or governmental entity accredited by the USDA Secretary of Agriculture for the purpose of certifying a production, processing or handling operation as organic.

**Claim for indemnity** - A claim made on our form by you for damage or loss to an insured crop and submitted to us not later than 60 days after the fall harvest price is released (see section 15).

**Code of Federal Regulations (CFR)** - The codification of general and permanent rules published in the Federal Register by the Executive departments and agencies of the Federal Government. Rules published in the Federal Register by FCIC are contained in 7 CFR chapter IV. The full text of the CFR is available in electronic format at http://www.access.gpo.gov/ or a successor website.

**Consent** - Approval in writing by us allowing you to take a specific action.

**Contract** - (See definition of "policy").

**Contract change date** - The calendar date by which changes to the policy, if any, will be made available in accordance with section 5 of these Basic Provisions.

**Conventional farming practice** - A system or process for producing an agricultural commodity, excluding organic farming practices, that is necessary to produce the crop that may be, but is not required to be, generally recognized by agricultural experts for the area to conserve or enhance natural resources and the environment.

**County** - Any county, parish, or other political subdivision of a state shown on your accepted application, including acreage in a field that extends into an adjoining county if the county boundary is not readily discernible.

**Coverage** - The insurance provided by this policy against insured loss of revenue, by unit, as shown on your summary of coverage.

**Cover crop** - A crop generally recognized by agricultural experts as agronomically sound for the area for erosion control or other purposes related to conservation or soil improvement. A cover crop may be considered to be a second crop (see the definition of "second crop").

**Coverage begins, date** - The calendar date insurance begins on the insured crop, as contained in the Crop Provisions, or the date planting begins on the unit (see section 12 of these Basic Provisions for specific provisions relating to prevented planting).

**Coverage level percent** - The percent, in 5% increments only, expressed in decimals (.xx), determined by dividing the per-acre revenue guarantee by the expected per-acre revenue.

**Crop premium per acre** - Your per-acre revenue guarantee multiplied by the applicable base rate.

**Crop Provisions** - The part of the policy that contains the specific provisions of insurance for each insured crop.

**Crop year** - The period within which the insured crop is normally grown, regardless of whether or not it is actually grown, and designated by the calendar year in which the insured crop is normally harvested, unless otherwise specified in the Crop Provisions.

**Damage** - Injury, deterioration, or loss of revenue of the insured crop due to insured or uninsured causes.

**Days** - Calendar days.

**Deductible** - The amount determined by subtracting the coverage level percent you choose from 100 percent. For example, if you elected a 65 percent coverage level, your deductible would be 35 percent (100% - 65% = 35%).

**Delinquent debt** - Any administrative fees or premiums for insurance issued under the authority of the Act, and the interest on those amounts, if applicable, that are not postmarked or received by us or our agent on or before the termination date unless you have entered into an agreement acceptable to us to pay such amounts or have filed for bankruptcy on or before the termination date; any other amounts due us for insurance issued under the authority of the Act (including, but not limited to, indemnities, prevented planting payments or replanting payments found not to have been earned or that were overpaid), and the interest on such amounts, if applicable, which are not postmarked or received by us or our agent by the due date specified in the notice to you of the amount due; or any amounts due under an agreement with you to pay the debt, which are not postmarked or received by us or our agent by the due dates specified in such agreement.

**Disinterested third party** - A person that does not have any familial relationship (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to have a familial relationship) with you or who will not benefit financially from the sale of the insured crop. Persons who are authorized to conduct

05-RA (Ed. 08/30/04)

quality analysis in accordance with the Crop Provisions are considered disinterested third parties unless there is a familial relationship.

**Double crop** - Producing two or more crops for harvest on the same acreage in the same crop year.

**Earliest planting date** - The initial planting date contained in the Special Provisions, which is the earliest date you may plant an insured agricultural commodity and qualify for a replanting payment if such payments are authorized by the Crop Provisions.

**End of insurance period, date of** - The date upon which your crop insurance coverage ceases for the crop year (see Crop Provisions and section 12).

**Expected per-acre revenue** - The approved yield times the projected harvest price (see section 1 of the Crop Provisions) for optional or basic units. A weighted average is used for enterprise or whole-farm units.

**FCIC** - The Federal Crop Insurance Corporation, a wholly owned government corporation within USDA.

**Field** - All acreage of tillable land within a natural or artificial boundary (e.g., roads, waterways, fences, etc.). Different planting patterns or planting different crops do not create separate fields.

**Final planting date** - The date contained in the Special Provisions for the insured crop by which the crop must initially be planted in order to be insured for the full per-acre revenue guarantee.

**First insured crop** - With respect to a single crop year and any specific crop acreage, the first instance that an agricultural commodity is planted for harvest or prevented from being planted and is insured under the authority of the Act. For example, if winter wheat that is not insured is planted on acreage that is later planted to soybeans that are insured, the first insured crop would be soybeans. If the winter wheat was insured, it would be the first insured crop.

**FSA** - The Farm Service Agency, an agency within USDA, or a successor agency.

**FSA Farm Serial Number** - The number assigned to the farm by the local FSA office.

**Generally recognized** - When agricultural experts or the organic agricultural industry, as applicable, are aware of the production method or practice and there is no genuine dispute regarding whether the production method or practice allows the crop to make normal progress toward maturity and produce at least the yield used to determine the revenue guarantee.

**Good farming practices** - The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the revenue guarantee, including any adjustments for late planted acreage, which are: (1) for conventional or sustainable farming practices, those generally recognized by agricultural experts for the area; or (2) for organic farming practices, those generally recognized by the organic agricultural industry for the area or contained in the organic plan. We may, or you may request us to, contact FCIC to determine whether or not production methods will be considered to be "good farming practices."

**Household** - A domestic establishment including the members of a family (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to be family members) and others who live under the same roof.

**Insurable loss** - Damage for which coverage is provided under the terms of your policy, and for which you accept an indemnity payment.

**Insured** - The named person as shown on the application accepted by us. This term does not extend to any other person having a share or interest in the crop (for example, a partnership, landlord, or any other person) unless specifically indicated on the accepted application.

**Insured crop** - The crop in the county for which coverage is available under your policy as shown on the application accepted by us.

**Interplanted** - Acreage on which two or more crops are planted in a manner that does not permit separate agronomic maintenance or harvest of the insured crop.

**Irrigated practice** - A method of producing a crop by which water is artificially applied during the growing season by appropriate systems and at the proper times, with the intention of providing the quantity of water needed to produce at least the yield used to establish the per-acre revenue guarantee on the irrigated acreage planted to the insured crop.

**Late planted** - Acreage initially planted to the insured crop after the final planting date.

**Late planting period** - The period that begins the day after the final planting date for the insured crop and ends 25 days after the final planting date, unless otherwise specified in the Crop Provisions or Special Provisions.

**Liability** - The dollar amount of insurance coverage used in the premium computation for the insured agricultural commodity.

**Limited Resource Farmer** - A person with:
(1) Direct or indirect gross farm sales not more than $100,000.00 in each of the previous two years (to be increased starting in fiscal year 2004 to adjust for inflation using Prices Paid by Farmer Index as compiled by National Agricultural Statistical Service (NASS)); and
(2) A total household income at or below the national poverty level for a family of four, or less than 50 percent of county median household income in each of the previous two years (to be determined annually using Commerce Department Data).

**MPCI** - Multiple peril crop insurance program, a program of insurance offered under the Act and implemented in 7 CFR chapter IV.

**Negligence** - The failure to use such care as a reasonably prudent and careful person would use under similar circumstances.

**Non-contiguous** - Acreage of an insured crop that is separated from other acreage of the same insured crop by land that is neither owned by you nor rented by you for cash or a crop share. However, acreage separated by only a public or private right-of-way, waterway, or an irrigation canal will be considered as contiguous.

**Offset** - The act of deducting one amount from another amount.

**Exhibit to Complaint Page 4**

0033

**Organic agricultural industry** - Persons who are employed by the following organizations: Appropriate Technology Transfer for Rural Areas, Sustainable Agriculture Research and Education or the Cooperative State Research, Education and Extension Service, the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific organic crop or practice for which such expertise is sought.

**Organic farming practice** - A system of plant production practices approved by a certifying agent in accordance with 7 CFR part 205.

**Organic plan** - A written plan, in accordance with the National Organic Program published in 7 CFR part 205, that describes the organic farming practices that you and a certifying agent agree upon annually or at such other times as prescribed by the certifying agent.

**Organic standards** - Standards under the Organic Foods Production Act of 1990 (7 U.S.C. 6501 *et seq.*) and 7 CFR part 205.

**Per-acre revenue guarantee** - The coverage level percent times your approved yield, times the projected harvest price. If you choose the fall harvest price option provided in the Crop Provisions, the per-acre revenue guarantee equals the coverage level percent, times the approved yield, times the greater of the projected harvest price or the fall harvest price (see section 1 of the Crop Provisions). For basic and optional units, the per-acre revenue guarantee may vary by unit. For an enterprise unit, the per-acre revenue guarantee is a weighted average and will be the same for all insured acres of the crop in the county. For the whole-farm unit, the per-acre revenue guarantee is a weighted average and will be the same for all insured acres in the county.

**Person** - An individual, partnership, association, corporation, estate, trust, or other legal entity, and wherever applicable, a State or a political subdivision or agency of a State. "Person" does not include the United States Government or any agency thereof.

**Planted acreage** - Land in which seed has been placed, appropriate for the insured crop and planting method, at the correct depth, into a seedbed that has been properly prepared for the planting method and production practice.

**Policy** - The agreement between you and us to insure an agricultural commodity consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, other applicable endorsements or options, the actuarial documents for the insured agricultural commodity, and the applicable regulations published in 7 CFR chapter IV. Insurance for each agricultural commodity in each county will constitute a separate policy.

**Practical to replant** - Our determination, after loss or damage to the insured crop, based on all factors, including, but not limited to moisture availability, marketing window, condition of the field, and time to crop maturity, that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period. It will be considered to be practical to replant regardless of availability of seed or plants, or the input costs necessary to produce the insured crop such as those that would be incurred for seed or plants, irrigation water, etc.

**Premium billing date** - The earliest date upon which you will be billed for insurance coverage based on your acreage report. The premium billing date is contained in the Special Provisions.

**Premium calculator** - A computer program that determines your per-acre premium based on your approved yield, per-acre revenue guarantee, coverage level percent, projected harvest price, unit options, and other factors such as crop, type, practice and county.

**Prevented planting** - Failure to plant the insured crop with proper equipment by the final planting date designated in the Special Provisions for the insured crop in the county. You may also be eligible for a prevented planting payment if you failed to plant the insured crop with the proper equipment within the late planting period. You must have been prevented from planting the insured crop due to an insured cause of loss that is general in the surrounding area and that prevents other producers from planting acreage with similar characteristics.

**Production report** - A written record showing your annual production and used by us to determine your yield for insurance purposes (see section 4). The report contains yield information for previous years, including planted acreage and harvested production. This report must be supported by written verifiable records from a warehouseman or buyer of the insured crop, or by measurement of farm stored production, or by other records of production approved by us on an individual case basis.

**Prohibited substance** - Any biological, chemical, or other agent that is prohibited from use or is not included in the organic standards for use on any certified organic, transitional or buffer zone acreage. Lists of such substances are contained at 7 CFR part 205.

**Replanted crop** - The same agricultural commodity replanted on the same acreage as the first insured crop for harvest in the same crop year if the replanting is specifically made optional by the policy and you elect to replant the crop and insure it under the policy covering the first insured crop, or replanting is required by the policy.

**Replanting** - Performing the cultural practices necessary to prepare the land to replace the seed or plants of the damaged or destroyed insured crop and then replacing the seed or plants of the same crop in the same insured acreage. The same crop does not necessarily mean the same type or variety of the crop unless different types or varieties constitute separate crops or it is otherwise specified in the policy.

**Representative sample** - Portions of the insured crop that must remain in the field for examination and review by our loss adjuster when making a crop appraisal, as specified in the Crop Provisions. In certain instances, we may allow you to harvest the crop and require only that samples of the crop residue be left in the field.

**Revenue guarantee** - The per-acre revenue guarantee times the number of insurable acres in the unit, and times your respective share.

**Sales closing date** - A date contained in the Special Provisions by which an application must be filed. The last date by which you may change your crop insurance

**Exhibit to Complaint Page 5**

coverage for a crop year.

**Second crop** - With respect to a single crop year, the next occurrence of planting any agricultural commodity for harvest following a first insured crop on the same acreage. The second crop may be the same or a different agricultural commodity as the first insured crop, except the term does not include a replanted crop. A cover crop, planted after a first insured crop and planted for the purpose of haying, grazing or otherwise harvesting in any manner or that is hayed or grazed during the crop year, or that is otherwise harvested is considered to be a second crop. A cover crop that is covered by FSA's noninsured crop disaster assistance program (NAP) or receives other USDA benefits associated with forage crops will be considered as planted for the purpose of haying, grazing, or otherwise harvesting. A crop meeting the conditions stated herein will be considered to be a second crop regardless of whether or not it is insured. Notwithstanding the references to haying and grazing as harvesting in these Basic Provisions, for the purpose of determining the end of the insurance period, harvest of the crop will be as defined in the applicable Crop Provisions.

**Section** - (for the purposes of unit structure) A unit of measure under a rectangular survey system describing a tract of land usually one mile square and usually containing approximately 640 acres.

**Share** - Your percentage of interest in the insured crop as an owner, operator, or tenant at the time insurance attaches. However, only for the purpose of determining the amount of indemnity, your share will not exceed your share at the earlier of the time of loss, or the beginning of harvest.

**Special Provisions** - The part of the policy that contains specific provisions of insurance for each insured crop that may vary by geographic area.

**State** - The state shown on your accepted application.

**Substantial beneficial interest** - An interest held by any person of at least 10 percent in you. The spouse of any individual applicant or individual insured will be considered to have a substantial beneficial interest in the applicant or insured unless the spouses can prove they are legally separated or otherwise legally separate under state law. Any child of an individual applicant or individual insured will not be considered to have a substantial beneficial interest in the applicant or insured unless the child has a separate legal interest in such person. For example, there are two partnerships that each have a 50 percent interest in you and each partnership is made up of two individuals, each with a 50 percent share in the partnership. In this case, each individual would be considered to have a 25 percent interest in you, and both the partnerships and the individuals would have a substantial beneficial interest in you (The spouses of the individuals would not be considered to have a substantial beneficial interest unless the spouse was one of the individuals that made up the partnership). However, if each partnership is made up of six individuals with equal interests, then each would only have an 8.33 percent interest in you and although the partnership would still have a substantial beneficial interest in you, the individuals would not for the purposes of reporting in section 3.

**Summary of coverage** - Our statement to you, based upon your acreage report, specifying the insured crop and the revenue guarantee provided by unit.

**Sustainable farming practice** - A system or process for producing an agricultural commodity, excluding organic farming practices, that is necessary to produce the crop and is generally recognized by agricultural experts for the area to conserve or enhance natural resources and the environment.

**Tenant** - A person who rents land from another person for a share of the crop or a share of the proceeds of the crop (see the definition of "share").

**Termination date** - The calendar date contained in the Crop Provisions upon which your insurance ceases to be in effect because of nonpayment of any amount due us under the policy, including premium.

**Timely planted** - Planted on or before the final planting date designated in the Special Provisions for the insured crop in the county.

**Transitional acreage** - Acreage on which organic farming practices are being followed that does not yet qualify to be designated as organic acreage.

**Unit** -
(a) Basic unit - A basic unit established in accordance with section 2(a).
(b) Optional unit - A unit established from basic units in accordance with section 2(b).
(c) Enterprise unit - A unit established from basic units or optional units in accordance with section 2(c).
(d) Whole-farm unit - A unit established from enterprise units in accordance with section 2(d).

**USDA** - United States Department of Agriculture.

**Void** - When the policy is considered not to have existed for a crop year as a result of concealment, fraud or misrepresentation (see section 27).

**Written agreement** - A document that alters designated terms of a policy as authorized under these Basic Provisions (see section 35).

2. **Unit Structure**
(a) Basic unit - All insurable acreage of the insured crop in the county on the date coverage begins for the crop year:
    (1) In which you have a 100 percent crop share; or
    (2) Which is owned by one person and operated by another person on a share basis. (Example: If, in addition to the land you own, you rent land from five landlords, three on a crop share basis and two on a cash basis, you would be entitled to four units, one for each crop share lease and one that combines the two cash leases and the land you own.) Land which would otherwise be one unit may, in certain instances, be divided according to guidelines contained in this section and in the applicable Crop Provisions.
(b) Optional unit - Unless limited by the Crop Provisions or Special Provisions, a basic unit as defined in section 2(a) of these Basic Provisions may be divided into optional units if, for each optional unit:
    (1) You meet the following:
        (i) You must plant the crop in a manner that results in a clear and discernible break in the planting pattern at the boundaries of each

**Exhibit to Complaint Page 6**

optional unit;

   (ii) All optional units you select for the crop year are identified on the acreage report for that crop year (Units will be determined when the acreage is reported but may be adjusted or combined to reflect the actual unit structure when adjusting a loss. No further unit division may be made by you after the acreage reporting date for any reason);

   (iii) You have records, that are acceptable to us, for at least the previous crop year for all optional units that you will report in the current crop year (You may be required to produce the records for all optional units for the previous crop year); and

   (iv) You have records of marketed or stored production from each optional unit maintained in such a manner that permits us to verify the production from each optional unit, or the production from each optional unit is kept separate until loss adjustment is completed by us.

(2) Each optional unit must also meet one or more of the following, unless otherwise specified in the Crop Provisions:

   (i) Optional units may be established if each optional unit is located in a separate section. In the absence of sections, we may consider parcels of land legally identified by other methods of measure such as Spanish grants, as the equivalents of sections for unit purposes. In areas which have not been surveyed using sections, section equivalents or in areas where boundaries are not readily discernible, each optional unit must be located in a separate FSA farm serial number;

   (ii) In addition to, or instead of, establishing optional units by section, section equivalent, or FSA farm serial number, optional units may be based on irrigated and non-irrigated acreage. To qualify as separate irrigated and non-irrigated optional units, the non-irrigated acreage may not continue into the irrigated acreage in the same rows or planting pattern. The irrigated acreage may not extend beyond the point at which the irrigation system can deliver the quantity of water needed to produce the yield on which your revenue guarantee is based, except the corners of a field in which a center-pivot irrigation system is used may be considered as irrigated acreage if the corners of a field in which a center-pivot irrigation system is used do not qualify as a separate non-irrigated optional unit. In this case, production from both practices will be used to determine your approved yield; and

   (iii) In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm serial number, or irrigated and

non-irrigated acreage, separate optional units may be established for acreage of the insured crop grown and insured under an organic farming practice. Certified organic, transitional and buffer zone acreages do not individually qualify as separate units. (See section 37 for additional provisions regarding acreage insured under an organic farming practice).

(3) If you do not comply fully with the provisions in this section, we will combine all optional units that are not in compliance with these provisions into the basic unit from which they were formed. We will combine the optional units at any time we discover that you have failed to comply with these provisions. If failure to comply with these provisions is determined by us to be inadvertent, and the optional units are combined into a basic unit, that portion of the additional premium paid for the optional units that have been combined will be refunded to you for the units combined.

(c) Enterprise unit - All insurable acreage of the insured crop in the county in which you have a share on the date coverage begins for the crop year. To qualify, an enterprise unit must contain all of the insurable planted acreage of the same insured crop in:

   (1) One or more basic units that are located in two or more separate sections, section equivalents, or FSA farm serial numbers, with at least some planted acreage in two or more separate sections, section equivalents, or FSA farm serial numbers; or

   (2) Two or more optional units established by separate sections, section equivalents, or FSA farm serial numbers, with at least two optional units containing some planted acreage.

(d) Whole-farm unit - All insurable acreage of two or more insured crops (must qualify for at least two enterprise units) planted in the county in which you have a share on the date coverage begins for each crop for the crop year. All crops which you have planted and for which the whole farm unit structure is available must be included in the whole farm unit. At least two of the insured crops must each constitute at least 10 percent of the total liability of all insured crops in the whole farm unit, and all crops in the unit must be insured under the same plan of insurance and with the same insurance provider. This unit is established from enterprise units as defined in section 2(c).

(e) Exclusivity Between Units - If you select whole-farm unit coverage, you cannot select any other unit structure for the crops that qualify for the whole farm unit. However, you may select an enterprise unit for one crop and basic or optional unit coverage for other crops.

(f) Selection of unit structure - You may elect an enterprise unit or a whole-farm unit subject to the following:

   (1) You must make such election by the earliest sales closing date for the insured crops and report such unit structure to us in writing. Your

**Exhibit to Complaint Page 7**

unit selection will remain in effect from year to year unless you notify us in writing by the earliest sales closing date for the crop year for which you wish to change this election. These units may not be further divided. If you select and qualify for an enterprise or whole-farm unit, you will qualify for a premium discount. At any time we discover you do not qualify for enterprise or whole-farm units, optional units or basic units will be determined based on your production reports (refer to Sec. 4(b) for allowable coverage levels).

(2) For a whole-farm unit:

    (i) You must report on your acreage report the acreage for each optional or basic unit for each crop produced in the county that comprises the whole-farm unit; and

    (ii) Although you may insure all of your crops under a whole-farm unit, except winter wheat, you will be required to pay separate applicable administrative fees for each crop included in the whole-farm unit.

(g) All applicable unit structures must be stated on the acreage report for each crop year.

## 3. Life of Policy, Cancellation, and Termination

(a) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy, or by us.

(b) Your application for insurance must contain your social security number (SSN) if you are an individual or employer identification number (EIN) if you are a person other than an individual, and all SSNs and EINs, as applicable, of all persons with a substantial beneficial interest in you, the coverage level, crop, type, variety, or class, plan of insurance, and any other material information required on the application to insure the crop. If you or someone with a substantial beneficial interest is not legally required to have a SSN or EIN, you must request and receive an identification number for the purposes of this policy from us or the Internal Revenue Service (IRS) if such identification number is available from the IRS. If any of the information regarding persons with a substantial beneficial interest changes during the crop year, you must revise your application by the next sales closing date applicable under your policy to reflect the correct information.

(1) Applications that do not contain your SSN, EIN or identification number, or any of the other information required in section 3(b) are not acceptable and insurance will not be provided (Except if you fail to report the SSNs, EINs or identification numbers of persons with a substantial beneficial interest in you, the provisions in section 3(b)(2) will apply);

(2) If the application does not contain the SSNs, EINs, or identification numbers of all persons with a substantial beneficial interest in you, you fail to revise your application in accordance with section 3(b), or the reported SSNs, EINs, or identification numbers are incorrect and the incorrect SSN, EIN,

or identification number has not been corrected by the acreage reporting date, and:

    (i) Such persons are eligible for insurance, the amount of coverage for all crops included on this application will be reduced proportionately by the percentage interest in you of such persons, you must repay the amount of indemnity, prevented planting payment or replanting payment that is proportionate to the interest of the persons whose SSN, EIN, or identification number was unreported or incorrect for such crops, and your premium will be reduced commensurately; or

    (ii) Such persons are not eligible for insurance, except as provided in section 3(b)(3), the policy is void and no indemnity, prevented planting payment or replanting payment will be owed for any crop included on this application, and you must repay any indemnity, prevented planting payment or replanting payment that may have been paid for such crops. If previously paid, the balance of any premium and any administrative fees will be returned to you, less twenty percent of the premium that would otherwise be due from you for such crops. If not previously paid, no premium or administrative fees will be due for such crops.

(3) The consequences described in section 3(b)(2)(ii) will not apply if you have included an ineligible person's SSN, EIN, or identification number on your application and do not include the ineligible person's share on the acreage report.

(c) After acceptance of the application, you may not cancel this policy for the initial crop year. Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(d) Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date shown in the Crop Provisions.

(e) Any amount due to us for any policy authorized under the Act will be offset from any indemnity or prevented planting payment due you for this or any other crop insured with us under the authority of the Act.

(1) Even if your claim has not yet been paid, you must still pay the premium and administrative fee on or before the termination date for you to remain eligible for insurance.

(2) If we offset any amount due us from an indemnity or prevented planting payment owed to you, the date of payment for the purpose of determining whether you have a delinquent debt will be the date that you submit the claim for indemnity in accordance with section 15(a)(3) (Your Duties).

(f) A delinquent debt for any policy will make you ineligible to obtain crop insurance authorized under the Act for any subsequent crop year and result in termination of all policies in accordance with section 3(f)(2).

(1) With respect to ineligibility:

(i) Ineligibility for crop insurance will be effective on:
  (A) The date that a policy was terminated in accordance with section 3(f)(2) for the crop for which you failed to pay premium, an administrative fee, or any related interest owed, as applicable;
  (B) The payment due date contained in any notification of indebtedness for any overpaid indemnity, prevented planting payment or replanting payment, if you fail to pay the amount owed, including any related interest owed, as applicable, by such due date;
  (C) The termination date for the crop year prior to the crop year in which a scheduled payment is due under a payment agreement if you fail to pay the amount owed by any payment date in any agreement to pay the debt; or
  (D) The termination date the policy was or would have been terminated under sections 3(f)(2)(i)(A), (B), or (C) if your bankruptcy petition is dismissed before discharge.
(ii) If you are ineligible and a policy has been terminated in accordance with section 3(f)(2), you will not receive any indemnity, prevented planting payment or replanting payment, if applicable, and such ineligibility and termination of the policy may affect your eligibility for benefits under other USDA programs. Any indemnity, prevented planting payment or replanting payment that may be owed for the policy before it has been terminated will remain owed to you, but may be offset in accordance with section 3(e), unless your policy was terminated in accordance with sections 3(f)(2)(i)(D) or (E).

(2) With respect to termination:
  (i) Termination will be effective on:
    (A) For a policy with unpaid administrative fees or premiums, the termination date immediately subsequent to the billing date for the crop year;
    (B) For a policy with other amounts due, the termination date immediately following the date you have a delinquent debt;
    (C) For each policy for which insurance has attached before you become ineligible, the termination date immediately following the date you become ineligible;
    (D) For execution of an agreement to pay any amounts owed and failure to make any scheduled payment, the termination date for the crop year prior to the crop year in which you failed to make the scheduled payment; or
    (E) For dismissal of a bankruptcy petition before discharge, the termination date the policy was or would have been

terminated under sections 3(f)(2)(i)(A), (B) or (C).
  (ii) For all policies terminated under sections 3(f)(2)(i)(D) and (E), any indemnities, prevented planting payments or replanting payments paid subsequent to the termination date must be repaid.
  (iii) Once the policy is terminated, it cannot be reinstated for the current crop year unless the termination was in error. Failure to timely pay because of illness, bad weather, or other such extenuating circumstances is not grounds for reinstatement in the current year.
(3) To regain eligibility, you must:
  (i) Repay the delinquent debt in full;
  (ii) Execute an agreement to pay any amounts owed and make payments in accordance with the agreement (We will not enter into an agreement with you to pay the amounts owed if you have previously failed to make a scheduled payment under the terms of any other agreement to pay with us or any other insurance provider); or
  (iii) File a petition to have your debts discharged in bankruptcy (Dismissal of the bankruptcy petition before discharge will terminate all policies in effect retroactive to the date your policy would have been terminated in accordance with section 3(f)(2)(i));
(4) After you become eligible for crop insurance, if you want to obtain coverage for your crops, you must submit a new application on or before the sales closing date for the crop (Since applications for crop insurance cannot be accepted after the sales closing date, if you make any payment after the sales closing date, you cannot apply for insurance until the next crop year);
(5) For example, for the 2003 crop year, if crop A, with a termination date of October 31, 2003, and crop B, with a termination date of March 15, 2004, are insured and you do not pay the premium for crop A by the termination date, you are ineligible for crop insurance as of October 31, 2003, and crop A's policy is terminated as of that date. Crop B's policy does not terminate until March 15, 2004, and an indemnity for the 2003 crop year may still be owed. If you enter an agreement to repay amounts owed on September 25, 2004, the earliest date by which you can obtain crop insurance for crop A is to apply for crop insurance by the October 31, 2004, sales closing date and for crop B is to apply for crop insurance by the March 15, 2005, sales closing date. If you fail to make a payment that was scheduled to be made on April 1, 2005, your policy will terminate as of October 31, 2004, for crop A, and March 15, 2005, for crop B, and no indemnity, prevented planting payment or replanting payment will be due for that crop year for either crop. You will not be eligible to apply for crop insurance for any crop until after the amounts owed are paid in full or you file a petition

**Exhibit to Complaint Page 9**

to discharge the debt in bankruptcy.

(6) If you are determined to be ineligible under section 3(f), persons with a substantial beneficial interest in you may also be ineligible until you become eligible again.

(g) If you die, disappear, or are judicially declared incompetent, or if you are an entity other than an individual and such entity is dissolved, the policy will terminate as of the date of death, judicial declaration, or dissolution. If such event occurs after coverage begins for any crop year, the policy will continue in force through the crop year and terminate at the end of the insurance period and any indemnity will be paid to the person or persons determined to be beneficially entitled to the indemnity. The premium will be deducted from the indemnity or collected from the estate. Death of a partner in a partnership will dissolve the partnership unless the partnership agreement provides otherwise. If two or more persons having a joint interest are insured jointly, death of one of the persons will dissolve the joint entity.

(h) We may cancel your policy if no premium is earned for 3 consecutive years.

(i) The cancellation and termination dates are contained in the Crop Provisions.

(j) When obtaining coverage, you must provide information regarding crop insurance coverage on any crop previously obtained from an approved insurance provider, including the date such insurance was obtained and the amount of the administrative fee.

(k) Any person may sign any document relative to crop insurance coverage on behalf of any other person covered by such a policy, provided that the person has a properly executed power of attorney or such other legally sufficient document authorizing such person to sign. You are still responsible for the accuracy of all information provided on your behalf and may be subject to the consequences in section 7(g), and any applicable consequences, if any information has been misreported.

(l) You are not eligible to participate in the Revenue Assurance program if you have elected the MPCI Catastrophic Risk Protection Endorsement except in the following instance: If you execute a High-Risk Land Exclusion Option for a Revenue Assurance Policy, you may elect to insure the "high-risk land" under an MPCI Catastrophic Risk Protection Endorsement provided that the Catastrophic Risk Protection Endorsement is obtained from us. If both policies are in force, the acreage of the crop covered under the Revenue Assurance policy and the acreage covered under an MPCI Catastrophic Risk Protection Endorsement will be considered as separate crops for insurance purposes, including the payment of administrative fees.

4. **Insurance Coverages**

(a) Unless adjusted or limited in accordance with your policy, your revenue guarantee, coverage level, approved yields, per-acre revenue guarantee, and projected harvest price at which an indemnity will be determined for each unit will be those used to calculate your summary of coverage for each crop year.

(b) You must select a coverage level percent by the sales closing date. The maximum allowable coverage level is 85 percent (.85 decimal format) and the minimum allowable is 65 percent (.65 decimal format):

(1) For basic and optional units, 80-85 percent coverage level is only available in counties and on crops where Multiple Peril Crop Insurance (MPCI) allows 80-85 percent coverage levels.

(2) If you have selected 80-85 percent coverage level for enterprise units or whole-farm units and do not qualify for either unit structure at loss time, we will change your unit structure to basic or optional units based on your production reports, and coverage level to the highest available for the crop and county.

(c) You may only select one coverage level percent that is applicable for all insurable acreage of the crop. You may change the coverage level percent for the following crop year by giving written notice to us not later than the sales closing date for the insured crop. If you do not select a new crop coverage level percent on or before the sales closing date, we will assign the previous year's coverage level percent or the nearest coverage level percent available. (For example: If you selected a 65 percent coverage level for the previous crop year and you do not select a new coverage level percent for the current crop year, we will assign the 65 percent coverage level for the current crop year if it is still available.)

(d) This policy is an alternative to the MPCI program and satisfies the requirements of section 508(b)(7) of the Act.

(e) You must report production to us for the previous crop year by the earlier of the acreage reporting date or 45 days after the cancellation date unless otherwise stated in the Special Provisions:

(1) If you do not provide the required production report, we will assign a yield for the previous crop year. The yield assigned by us will not be more than 75 percent of the yield used by us to determine your coverage for the previous crop year. The production report or assigned yield will be used to compute your approved yield for the purpose of determining your revenue guarantee for the current crop year.

(2) If you have filed a claim for any crop year, the documents signed by you which state the amount of production used to complete the claim for indemnity will be the production report for that year unless otherwise specified by FCIC.

(3) Production and acreage for the prior crop year must be reported for each proposed optional unit by the production reporting date. If you do not provide the information stated above, the optional units will be combined into the basic unit.

(4) Appraisals obtained from only a portion of the acreage in a field that remains unharvested after the remainder of the crop within the field has been destroyed or put to another use will not be used to establish your actual yield unless

representative samples are required to be left by you in accordance with the Crop Provisions.

(f) It is your responsibility to accurately report all information that is used to determine your approved yield. You must certify to the accuracy of this information on your production report.

   (1) If you do not have written verifiable records to support the information on your production report, you will receive an assigned yield in accordance with section 4(e)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have such records.

   (2) If you misreport any material information used to determine your approved yield:

     (i) We will correct the unit structure, if necessary; and

     (ii) You will be subject to the provisions regarding misreporting contained in section 7(g), unless we correct the information because the incorrect information was the result of our error or the error of someone from USDA.

(g) In addition to any consequences in section 4(f), at any time the circumstances described below are discovered, your approved yield will be adjusted:

   (1) By including an assigned yield determined in accordance with section 4(e)(1) and 7 CFR part 400, subpart G, if the actual yield reported in the database is excessive for any crop year, as determined by FCIC under its procedures, and you do not provide verifiable records to support the yield in the database (If there are verifiable records for the yield in your database, the yield is significantly different from the other yields in the county or your other yields for the crop and you cannot prove there is a valid basis to support the differences in the yields, the yield will be the average of the yields for the crop or the applicable county transitional yield if you have no other yields for the crop, and you may be subject to provisions of section 27);

   (2) By reducing it to an amount consistent with the average of the approved yields for other databases for your farming operation with the same crop, type, and practice or the county transitional yield, as applicable, if:

     (i) The approved APH yield is greater than 115 percent of the average of the approved yields of all applicable databases for your farming operation that have actual yields in them or it is greater than 115 percent of the county transitional yield if no applicable databases exist for comparison; and

     (ii) The current year's insured acreage (including applicable prevented planting acreage) is greater than 400 percent of the average number of acres in the database or the acres contained in two or more individual years in the database are each less than 10 percent of the current year's insurable acreage in the unit (including applicable prevented planting acreage); or

   (3) To an amount consistent with the production methods actually carried out for the crop year if you use a different production method than was previously used and the production method actually carried out is likely to result in a yield lower than the average of your previous actual yields. The yield will be adjusted based on your other units where such production methods were carried out or to the applicable county transitional yield for the production methods if other such units do not exist. You must notify us of changes in your production methods by the acreage reporting date. If you fail to notify us, in addition to the reduction of your approved yield described herein, you will be considered to have misreported information and you will be subject to the consequences in section 7(g). For example, for a non-irrigated unit, your yield is based upon acreage of the crop that is watered once prior to planting, and the crop is not watered prior to planting for the current crop year. Your approved APH yield will be reduced to an amount consistent with the actual production history of your other non-irrigated units where the crop has not been watered prior to planting or limited to the non-irrigated transitional yield for the unit if other such units do not exist.

(h) Unless you meet the double cropping requirements contained in section 18(f)(4), if you elect to plant a second crop on acreage where the first insured crop was prevented from being planted, you will receive a yield equal to 60 percent of the approved yield for the first insured crop to calculate your average yield for subsequent crop years (Not applicable to crops if the APH is not the basis for the insurance guarantee). If the unit contains both prevented planting and planted acreage of the same crop, the yield for the unit will be determined by:

   (1) Multiplying the number of insured prevented planting acres by 60 percent of the approved yield for the first insured crop;

   (2) Adding the totals from section 4(h)(1) to the amount of appraised or harvested production for all of the insured planted acreage; and

   (3) Dividing the total in section 4(h)(2) by the total number of acres in the unit.

(i) The applicable premium rate, or formula to calculate the premium rate, and transitional yield will be those contained in the actuarial documents except, in the case of high risk land, a written agreement may be requested to change such premium rate.

5. **Contract Changes**

(a) We may change the terms of your coverage under this policy from year to year.

(b) Any changes in policy provisions, available coverage level percents, premium rates, and program dates (except as allowed herein or as specified in section 4) can be viewed on the RMA website at http://www.rma.usda.gov/ or a successor website not later than the contract change date contained in the

05-RA (Ed. 08/30/04)

Exhibit to Complaint Page 11

0040

Crop Provisions. We may only revise this information after the contract change date to correct clear errors (For example, the price for corn was announced at $25.00 per bushel instead of $2.50 per bushel or the final planting date should be May 10 but the final planting date in the Special Provisions states August 10).

    (c) After the contract change date, all changes specified in section 5(b) will also be available upon request from your crop insurance agent. You will be provided, in writing, a copy of the changes to the Basic Provisions and Crop Provisions and a copy of the Special Provisions not later than 30 days prior to the cancellation date for the insured crop. Acceptance of the changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

**6. [Reserved]**

**7. Report of Acreage**

    (a) An annual acreage report must be submitted to us on our form for each insured crop in the county on or before the acreage reporting date contained in the Special Provisions, except as follows:

        (1) If you insure multiple crops with us that have final planting dates on or after August 15 but before December 31, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops; and

        (2) If you insure multiple crops with us that have final planting dates on or after December 31 but before August 15, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops.

        (3) Notwithstanding the provisions in sections 7(a)(1) and (2):

            (i) If the Special Provisions designate separate planting periods for a crop, you must submit an acreage report for each planting period on or before the acreage reporting date contained in the Special Provisions for the planting period; and

            (ii) If planting of the insured crop continues after the final planting date or you are prevented from planting during the late planting period, the acreage reporting date will be the later of:

                (A) The acreage reporting date contained in the Special Provisions;

                (B) The date determined in accordance with sections 7(a)(1) or (2); or

                (C) Five days after the end of the late planting period for the insured crop, if applicable.

    (b) If you do not have a share in an insured crop in the county for the crop year, you must submit an acreage report on or before the acreage reporting date, so indicating.

    (c) Your acreage report must include the following information, if applicable:

        (1) All acreage of the crop in the county (insurable and not insurable) in which you have a share;

        (2) Your share at the time coverage begins;

        (3) The practice;

        (4) The type or variety; and

        (5) The date the insured crop was planted.

    (d) Regarding the ability to revise an acreage report you have submitted to us:

        (1) For planted acreage, you cannot revise any information pertaining to the planted acreage after the acreage reporting date without our consent (Consent may only be provided when no cause of loss has occurred; our appraisal has determined that the insured crop will produce at least 90 percent of the yield used to determine your revenue guarantee for the unit (including reported and unreported acreage), except when there are unreported units (see section 7(f)); the information on the acreage report is clearly transposed; you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report; or if expressly permitted by the policy);

        (2) For prevented planting acreage reported on the acreage report, you cannot revise any information pertaining to the prevented planting acreage after the report is initially submitted to us without our consent (Consent may only be provided when information on the acreage report is clearly transposed or you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report);

        (3) For prevented planting acreage not reported on the acreage report, you cannot revise your acreage report to add prevented planting acreage;

        (4) If you request an acreage measurement prior to the acreage reporting date and submit documentation of such request and an acreage report with estimated acreage by the acreage reporting date, you must provide the measurement to us, we will revise your acreage report if there is a discrepancy, and no indemnity, prevented planting payment or replant payment will be paid until the acreage measurement has been received by us (Failure to provide the measurement to us will result in the application of section 7(g) if the estimated acreage is not correct and estimated acreage under this section will no longer be accepted for any subsequent acreage report);

        (5) If there is an irreconcilable difference between:

            (i) The acreage measured by FSA or a measuring service and our on-farm measurement, our on-farm measurement will be used; or

            (ii) The acreage measured by a measuring service, other than our on-farm measurement, and FSA, the FSA measurement will be used; and

        (6) If the acreage report has been revised in accordance with section 7(d)(1), (2), (4), or (5), the information on the initial acreage report will not be

**Exhibit to Complaint Page 12**

considered misreported for the purposes of section 7(g).

(e) We may elect to determine all premiums and indemnities based on the information you submit on the acreage report or upon the factual circumstances we determine to have existed, subject to the provisions contained in section 7(g).

(f) If you do not submit an acreage report by the acreage reporting date, or if you fail to report all units, we may elect to determine by unit the insurable crop acreage, share, type and practice, or to deny liability on such units. If we deny liability for the unreported units, your share of any production from the unreported units will be allocated, for loss purposes only, as production to count to the reported units in proportion to the liability on each reported unit. However, such production will not be allocated to prevented planting acreage or otherwise affect any prevented planting payment.

(g) You must provide all required reports and you are responsible for the accuracy of all information contained in those reports. You should verify the information on all such reports prior to submitting them to us.

  (1) If you submit information on any report that is different than what is determined to be correct and such information results in:

    (i) A lower liability than the actual liability determined, the revenue guarantee on the unit will be reduced to an amount consistent with the reported information (In the event the insurable acreage is under-reported for any unit, all production or value from insurable acreage in that unit will be considered production or value to count in determining the indemnity); or

    (ii) A higher liability than the actual liability determined, the information contained in the acreage report will be revised to be consistent with the correct information.

  (2) In addition to the other adjustments specified in section 7(g)(1), if you misreport any information that results in liability greater than 110.0 percent or lower than 90.0 percent of the actual liability determined for the unit, any indemnity, prevented planting payment, or replanting payment will be based on the amount of liability determined in accordance with section 7(g)(1)(i) or (ii) and will be reduced in an amount proportionate with the amount of liability that is misreported in excess of the tolerances stated in this section (For example, if the actual liability is determined to be $100.00, but you reported liability of $120.00, any indemnity, prevented planting payment or replanting payment will be reduced by 10.0 percent ($120.00 / $100.00 = 1.20, and 1.20 − 1.10 = 0.10)).

(h) If we discover you have incorrectly reported any information on the acreage report for any crop year, you may be required to provide documentation in subsequent crop years substantiating your report of acreage for those crop years, including, but not limited to, an acreage measurement service at your own expense. If the correction of any misreported information would affect an indemnity, prevented planting payment or replant payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

  (i) Errors in reporting units may be corrected by us at the time of adjusting a loss to reduce our liability and to conform to applicable unit division guidelines.

**8.  Annual Premium and Administrative Fees**

(a) The annual premium is earned and payable at the time coverage begins. You will be billed for the premium and administrative fee not earlier than the premium billing date specified in the Special Provisions.

(b) Premium or administrative fees owed by you will be offset from an indemnity or prevented planting payment due you in accordance with section 3(e).

(c) Your annual premium amount is determined by unit by multiplying the crop premium per acre, times the insured crop acreage, times any premium adjustment factor that may apply, times your respective share at the time coverage begins, and less producer premium subsidy.

(d) The information needed to determine the premium rate and any premium adjustment percentages that may apply are contained in the actuarial documents or an approved written agreement.

(e) The premium subsidy amount depends on the coverage level percent and is calculated by multiplying the premium times the subsidy factor. If the coverage level percent is equal to or greater than .65 and less than .75, the premium subsidy factor is .59. If the coverage level percent is equal to or greater than .75 and less than .80, the premium subsidy factor is .55. If the coverage level percent is equal to or greater than .80 and less than .85, the premium subsidy factor is .48. If the coverage level percent is equal to or greater than .85, the premium subsidy factor is .38. The producer premium equals the premium less the premium subsidy.

(f) In addition to the premium charged:

  (1) You, unless otherwise authorized in 7 CFR part 400, must pay an administrative fee of $30 per crop per county for each crop year in which crop insurance coverage remains in effect;

  (2) The administrative fee must be paid no later than the time that premium is due;

  (3) Payment of an administrative fee will not be required if you file a bona fide zero acreage report on or before the acreage reporting date for the crop. If you falsely file a zero acreage report, you may be subject to criminal and administrative sanctions;

  (4) The administrative fee will be waived if you request it and:

    (i) You qualify as a limited resource farmer; or

    (ii) You were insured prior to the 2005 crop year or for the 2005 crop year and your administrative fee was waived for one or more of those crop years because you qualified as a limited resource farmer under

a policy definition previously in effect, and you remain qualified as a limited resource farmer under the definition that was in effect at the time the administrative fee was waived; and

(5) Failure to pay the administrative fees when due may make you ineligible for certain other USDA benefits.

(g) If the amount of premium (gross premium less premium subsidy paid on your behalf by FCIC) and administrative fee are required to pay for any acreage exceeds the liability for the acreage, coverage for those acres will not be provided (no premium or administrative fee will be due and no indemnity will be paid for such acreage).

## 9. Insured Crop

(a) The insured crop will be that shown on your accepted application and as specified in the Crop Provisions or Special Provisions and must be grown on insurable acreage.

(b) A crop which will **NOT** be insured will include, but will not be limited to, any crop:

(1) That is not grown on planted acreage (except for the purposes of prevented planting coverage), or that is a type, class or variety or where the conditions under which the crop is planted are not generally recognized for the area (For example, where agricultural experts determine that planting a non-irrigated corn crop after a failed small grain crop on the same acreage in the same crop year is not appropriate for the area);

(2) For which the information necessary for insurance (price, premium rate, etc.) is not included in the actuarial documents, unless such information is provided by a written agreement;

(3) That is a volunteer crop;

(4) Planted following the same crop on the same acreage and the first planting of the crop has been harvested in the same crop year unless specifically permitted by the Crop Provisions or the Special Provisions (For example, the second planting of grain sorghum would not be insurable if grain sorghum had already been planted and harvested on the same acreage during the crop year);

(5) That is planted for the development or production of hybrid seed or for experimental purposes, unless permitted by the Crop Provisions; or

(6) That is used solely for wildlife protection or management. If the lease states that specific acreage must remain uninsurable, only that acreage is uninsurable. If the lease specifies that a percentage of the crop must be left unharvested, your share will be reduced by such percentage.

(c) Although certain policy documents may state that a crop type, class, variety or practice is not insurable, it does not mean all other crop types, classes, varieties or practices are insurable. To be insurable the crop type, class, variety or practice must meet all the conditions in this section.

## 10. Insurable Acreage

(a) Acreage planted to the insured crop in which you have a share is insurable except acreage:

(1) That has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years unless you can show that:

(i) Such acreage was not planted:

(A) In at least two of the previous three crop years to comply with any other USDA program;

(B) Because of crop rotation (e.g., corn, soybeans, alfalfa; and the alfalfa remained for four years before the acreage was planted to corn again); or

(C) Because a perennial tree, vine, or bush crop was grown on the acreage;

(ii) The Crop Provisions or a written agreement specifically allow insurance for such acreage; or

(iii) Such acreage constitutes five percent or less of the insured planted acreage in the unit;

(2) That has been strip-mined, unless otherwise approved by written agreement, or unless an agricultural commodity other than a cover, hay, or forage crop (except corn silage), has been harvested from the acreage for at least five crop years after the strip-mined land was reclaimed;

(3) For which the actuarial documents do not provide the information necessary to determine the premium rate, unless insurance is allowed by a written agreement;

(4) On which the insured crop is damaged and it is practical to replant the insured crop, but the insured crop is not replanted;

(5) That is interplanted, unless allowed by the Crop Provisions;

(6) That is otherwise restricted by the Crop Provisions or Special Provisions;

(7) That is planted in any manner other than as specified in the policy provisions for the crop;

(8) Of a second crop, if you elect not to insure such acreage when an indemnity for a first insured crop may be subject to reduction in accordance with the provisions of section 16 and you intend to collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop acreage. This election must be made on a first insured crop unit basis. For example, if the first insured crop unit contains 40 planted acres that may be subject to an indemnity reduction, then no second crop can be insured on any of the 40 acres. In this case:

(i) If the first insured crop is insured under this policy, you must provide written notice to us of your election not to insure acreage of a

Exhibit to Complaint Page 14

0043

second crop at the time the first insured crop acreage is released by us (if no acreage in the first insured crop unit is released, this election must be made by the earlier of the acreage reporting date for the second crop or when you sign the claim for indemnity for the first insured crop) or, if the first insured crop is insured under the Group Risk Protection Plan of Insurance (7 CFR part 407), this election must be made before the second crop insured under this policy is planted, and if you fail to provide such notice, the second crop acreage will be insured in accordance with the applicable policy provisions and you must repay any overpaid indemnity for the first insured crop;

(ii) In the event a second crop is planted and insured with a different insurance provider, or planted and insured by a different person, you must provide written notice to each insurance provider that a second crop was planted on acreage on which you had a first insured crop; and

(iii) You must report the crop acreage that will not be insured on the applicable acreage report; or

(9) Of a crop planted following a second crop or following an insured crop that is prevented from being planted after a first insured crop, unless it is a practice that is generally recognized by agricultural experts or the organic agricultural industry for the area to plant three or more crops for harvest on the same acreage in the same crop year, and additional coverage insurance provided under the authority of the Act is offered for the third or subsequent crop in the same crop year. Insurance will only be provided for a third or subsequent crop as follows:

(i) You must provide records acceptable to us that show:

(A) You have produced and harvested the insured crop following two other crops harvested on the same acreage in the same crop year in at least two of the last four years in which you produced the insured crop; or

(B) The applicable acreage has had three or more crops produced and harvested on it in at least two of the last four years in which the insured crop was grown on it; and

(ii) The amount of insurable acreage will not exceed 100 percent of the greatest number of acres for which you provide the records required in section 10(a)(9)(i)(A) or (B).

(b) If insurance is provided for an irrigated practice, you must report as irrigated only that acreage for which you have adequate facilities, and adequate water, or the reasonable expectation of receiving adequate water at the time coverage begins, to carry out a good irrigation

practice. If you knew or had reason to know that your water may be reduced before coverage begins, no reasonable expectation exists.

(c) Notwithstanding the provisions in section 9(b)(2), if acreage is irrigated and we do not provide a premium rate for an irrigated practice, you may either report and insure the irrigated acreage as "non-irrigated," or report the irrigated acreage as not insured.

(d) We may restrict the amount of acreage that we will insure to the amount allowed under any acreage limitation program established by the USDA if we notify you of that restriction prior to the sales closing date.

**11. Share Insured**

(a) Insurance will attach only to the share of the person completing the application and will not extend to any other person having a share in the crop unless the application clearly states that:

(1) The insurance is requested for an entity such as a partnership or a joint venture; or

(2) You as landlord will insure your tenant's share, or you as tenant will insure your landlord's share. In this event, you must provide evidence of the other party's approval (lease, power of attorney, etc.). Such evidence will be retained by us. You also must clearly set forth the percentage shares of each person on the acreage report. For each landlord or tenant that is an individual, you must report the landlord's or tenant's social security number. For each landlord or tenant that is a person other than an individual or for a trust administered by the Bureau of Indian Affairs, you must report each landlord's or tenant's social security number, employer identification number, or other identification number assigned for the purposes of this policy.

(b) We may consider any acreage or interest reported by or for your spouse, child or any member of your household to be included in your share.

(c) Acreage rented for a percentage of the crop, or a lease containing provisions for **BOTH** a minimum payment (such as a specified amount of cash, bushels, pounds, etc.) **AND** a crop share, will be considered a crop share lease.

(d) Acreage rented for cash, or a lease containing provisions for **EITHER** a minimum payment **OR** a crop share (such as a 50/50 share or $100.00 per acre, whichever is greater), will be considered a cash lease.

**12. Insurance Period**

(a) Except for prevented planting coverage (see section 18), coverage begins on each unit or part of a unit at the later of:

(1) The date we accept your application (For the purposes of this paragraph, the date of acceptance is the date that you submit a properly executed application in accordance with section 3);

(2) The date the insured crop is planted; or

(3) The calendar date contained in the Crop Provisions for the beginning of the insurance period.

(b) Coverage ends at the earliest of:

Exhibit to Complaint Page 15

(1) Total destruction of the insured crop on the unit;
(2) Harvest of the unit;
(3) Final adjustment of a loss on a unit;
(4) The calendar date contained in the Crop Provisions for the end of the insurance period;
(5) Abandonment of the crop on the unit; or
(6) As otherwise specified in the Crop Provisions.

## 13. Causes of Loss

The insurance provided is against only unavoidable loss directly caused by specific causes of loss contained in the Crop Provisions. All specified causes of loss, except where the Crop Provisions specifically cover loss of revenue due to a reduced price in the marketplace, must be due to a naturally occurring event. All other causes of loss, including but not limited to the following, are NOT covered:

(a) Negligence, mismanagement, or wrongdoing by you, any member of your family or household, your tenants, or employees;
(b) Failure to follow recognized good farming practices for the insured crop;
(c) Water that is contained by or within structures that are designed to contain a specific amount of water, such as dams, locks or reservoir projects, etc., on any acreage when such water stays within the designed limits (For example, a dam is designed to contain water to an elevation of 1,200 feet but you plant a crop on acreage at an elevation of 1,100 feet. A storm causes the water behind the dam to rise to an elevation of 1,200 feet. Under such circumstances, the resulting damage would not be caused by an insurable cause of loss. However, if you planted on acreage that was above 1,200 feet elevation, any damage caused by water that exceeded that elevation would be caused by an insurable cause of loss);
(d) Failure or breakdown of the irrigation equipment or facilities unless the failure or breakdown is due to a cause of loss specified in the Crop Provisions (If damage is due to an insured cause, you must make all reasonable efforts to restore the equipment or facilities to proper working order within a reasonable amount of time unless we determine it is not practical to do so. Cost will not be considered when determining whether it is practical to restore the equipment or facilities);
(e) Failure to carry out a good irrigation practice for the insured crop if applicable; or
(f) Any cause of loss that results in damage that is not evident or would not have been evident during the insurance period, including, but not limited to, damage that only becomes evident after the end of the insurance period unless expressly authorized in the Crop Provisions. Even though we may not inspect the damaged crop until after the end of the insurance period, damage due to insured causes that would have been evident during the insurance period will be covered.

## 14. Replanting Payment

(a) If allowed by the Crop Provisions, a replanting payment may be made on an insured crop replanted after we have given consent and the acreage replanted is at least the lesser of 20 acres or 20 percent of the insured planted acreage for the unit (as determined on the final planting date or within the late planting period if a late planting period is applicable). The 20 acres or 20 percent requirement is to be applied for each crop in a whole-farm unit.
(b) No replanting payment will be made on acreage:
(1) On which our appraisal establishes that production will exceed the level set by the Crop Provisions;
(2) Initially planted prior to the earliest planting date established by the Special Provisions; or
(3) On which one replanting payment has already been allowed for the crop year.
(c) The replanting payment per acre will be your actual cost for replanting, but will not exceed the amount determined in accordance with the Crop Provisions.
(d) No replanting payment will be paid if we determine it is not practical to replant.

## 15. Duties In The Event of Damage, Loss, Abandonment, Destruction, or Alternative Use of Crop or Acreage.

(a) Your Duties -
(1) In case of damage to any insured crop you must:
(i) Protect the crop from further damage by providing sufficient care;
(ii) Give us notice within 72 hours of your initial discovery of damage (but not later than 15 days after the end of the insurance period), by unit, for each insured crop;
(iii) If representative samples are required by the Crop Provisions, leave representative samples intact of the unharvested crop if you report damage less than 15 days before the time you begin harvest or during harvest of the damaged unit (The samples must be left intact until we inspect them or until 15 days after completion of harvest on the unit, whichever is earlier. Unless otherwise specified in the Crop Provisions or Special Provisions, the samples of the crop in each field in the unit must be 10 feet wide and extend the entire length of the row, if the crop is planted in rows, or if the crop is not planted in rows, the longest dimension of the field. The period to retain representative samples may be extended if it is necessary to accurately determine the loss. You will be notified in writing of any such extension); and
(iv) Give us notice of your expected revenue loss not later than 45 days after the date the fall harvest price is released; and
(v) Cooperate with us in the investigation or settlement of the claim, and, as often as we reasonably require:
(A) Show us the damaged crop;
(B) Allow us to remove samples of the insured crop; and
(C) Provide us with records and documents we request and permit us to make copies.
(2) You must obtain consent from us before, and notify us after you:
(i) Destroy any of the insured crop that is not

**Exhibit to Complaint Page 16**

0045

harvested;

(ii) Put the insured crop to an alternative use;

(iii) Put the acreage to another use; or

(iv) Abandon any portion of the insured crop. We will not give consent for any of the actions in sections 15(a)(2)(i) through (iv) if it is practical to replant the crop or until we have made an appraisal of the potential production of the crop.

(3) In addition to complying with the notice requirements, you must submit a claim for indemnity declaring the amount of your loss not later than 60 days after the fall harvest price is released unless you request an extension in writing and we agree to such extension. Extensions will only be granted if the amount of the loss cannot be determined within such time period because the information needed to determine the amount of the loss is not available. The claim for indemnity must include all information we require to settle the claim. Failure to submit a claim or provide the required information will result in no indemnity, prevented planting payment or replant payment (Even though no indemnity or other payment is due, you will still be required to pay the premium due under the policy for the unit).

(4) You must:

(i) Provide a complete harvesting and marketing record of each insured crop by unit including separate records showing the same information for production from any acreage not insured.  In addition, if you insure any acreage that may be subject to an indemnity reduction as specified in section 16(d)(2) (for example, you planted a second crop on acreage where a first insured crop had an insurable loss and you do not qualify for the double cropping exemption), you must provide separate records of production from such acreage for all insured crops planted on the acreage.  For example, if you have an insurable loss on 10 acres of wheat and subsequently plant cotton on the same 10 acres, you must provide records of the wheat and cotton production on the 10 acres separate from any other wheat and cotton production that may be planted in the same unit.  If you fail to provide such separate records, we will allocate the production of each crop to the acreage in proportion to our liability for the acreage; and

(ii) Upon our request, or that of any USDA employee authorized to conduct investigations of the crop insurance program, submit to an examination under oath.

(5) You must establish the total production or value received for the insured crop on the unit, that any loss of production or value occurred during the insurance period, and that the loss of production or value was directly caused by one or more of the insured causes specified in the Crop Provisions.

(6) In the event you are prevented from planting an insured crop which has prevented planting coverage, you must notify us within 72 hours after:

(i) The final planting date, if you do not intend to plant the insured crop during the late planting period or if a late planting period is not applicable; or

(ii) You determine you will not be able to plant the insured crop within any applicable late planting period.

(7) All notices required in this section that must be received by us within 72 hours may be made by telephone or in person to your crop insurance agent but must be confirmed in writing within 15 days.

(8) It is your duty to prove you have complied with all provisions of this policy.

(i) Failure to comply with the requirements of section 15(a)(3) (Your Duties) will result in denial of your claim for indemnity and prevented planting or replant payment for the acreage for which failure occurred. Failure to comply with all other requirements of this section will result in denial of your claim for indemnity or prevented planting or replant payment for the acreage for which the failure occurred, unless we still have the ability to accurately adjust the loss (Even though no indemnity or other payment is due, you will still be required to pay the premium due under the policy for the unit); and

(ii) Failure to comply with other sections of the policy will subject you to the consequences specified in those sections.

(b) Our Duties -

(1) If you have complied with all the policy provisions, we will pay your loss within 30 days after the later of:

(i) We reach agreement with you;

(ii) Completion of arbitration, reconsideration of determinations regarding good farming practices or any other appeal that results in an award in your favor, unless we exercise our right to appeal such decision;

(iii) Completion of any investigation by USDA, if applicable, of your current or any past claim for indemnity if no evidence of wrongdoing has been found (If any evidence of wrongdoing has been discovered, the amount of any indemnity, prevented planting or replant overpayment as a result of such wrongdoing may be offset from any indemnity or prevented planting payment owed to you); or

(iv) The entry of a final judgment by a court of competent jurisdiction.

(2) In the event we are unable to pay your loss within 30 days, we will give you notice of our intentions within the 30-day period.

(3) We may defer the adjustment of a loss until the amount of loss can be accurately determined. We will not pay for additional damage resulting from

**Exhibit to Complaint Page 17**

**0046**

your failure to provide sufficient care for the crop during the deferral period.

(4) We recognize and apply the loss adjustment procedures established or approved by FCIC.

(5) We may make partial/preliminary indemnity payments for crop production losses on policies prior to the release of the fall harvest price:

(i) Without the Fall Harvest Option:
A partial/preliminary indemnity payment may not be made because the valuation of the production to count could lead to overpayment situations unless if a total crop loss (no production to count).

(ii) With the Fall Harvest Option:
If the fall harvest price has not been released at the time a loss is determined, then we may pay adjusted losses in two segments.

(A) First, we may pay an initial indemnity based upon the projected harvest price, your production to count, and share.

(B) Second, once we know the fall harvest price, and if it is greater than the projected harvest price, we recalculate the indemnity payment and pay the additional indemnity due. If we know the fall harvest price at the time a loss is determined, then we will pay adjusted losses based upon the greater of the projected harvest price or the fall harvest price.

## 16. Production Included In Determining an Indemnity and Payment Reductions

(a) The total production to be counted for a unit will include all production determined in accordance with the policy.

(b) Appraised production will be used to calculate your claim if you are not going to harvest your acreage. Such appraisals may be conducted after the end of the insurance period. If you harvest the crop after the crop has been appraised:

(1) You must provide us with the amount of harvested production; and

(2) If the harvested production exceeds the appraised production, claims will be adjusted using the harvested production, and you will be required to repay any overpaid indemnity; or

(3) If the harvested production is less than the appraised production, and:

(i) You harvest after the end of the insurance period, your appraised production will be used to adjust the loss unless you can prove that no additional causes of loss or deterioration of the crop occurred after the end of the insurance period; or

(ii) You harvest before the end of the insurance period, your harvested production will be used to adjust the loss.

(c) The amount of an indemnity that may be determined under the applicable provisions of your policy may be reduced by an amount, determined in accordance with the Crop Provisions or Special Provisions, to reflect out-of-pocket expenses that were not incurred by you

as a result of not planting, caring for, or harvesting the crop. Indemnities paid for acreage prevented from being planted will be based on a reduced revenue guarantee as provided for in the policy and will not be further reduced to reflect expenses not incurred.

(d) With respect to acreage where you have suffered an insurable loss to planted acreage of your first insured crop in the crop year, except in the case of double cropping described in section 16(g):

(1) You may elect to not plant or to plant and not insure a second crop on the same acreage for harvest in the same crop year and collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop; or

(2) You may elect to plant and insure a second crop on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

(i) Collect an indemnity payment that is 35 percent of the insurable loss for the first insured crop;

(ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop; and

(iii) If the second crop does not suffer an insurable loss:

(A) Collect an indemnity payment for the other 65 percent of insurable loss that was not previously paid under section 16(d)(2)(i); and

(B) Be responsible for the remainder of the premium for the first insured crop that you did not pay under section 16(d)(2)(ii).

(e) With respect to acreage where you were prevented from planting the first insured crop in the crop year, except in the case of double cropping described in section 16(g):

(1) If a second crop is not planted on the same acreage for harvest in the same crop year, you may collect a prevented planting payment that is equal to 100 percent of the prevented planting payment for the acreage for the first insured crop; or

(2) If a second crop is planted on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

(i) Provided the second crop is not planted on or before the final planting date or during the late planting period (as applicable) for the first insured crop, you may collect a prevented planting payment that is 35

Exhibit to Complaint Page 18

percent of the prevented planting payment for the first insured crop; and

    (ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop.

(f) The reduction in the amount of indemnity or prevented planting payment and premium specified in sections 16(d) and (e), as applicable, will apply:

    (1) Notwithstanding the priority contained in the Agreement to Insure section, which states that the Crop Provisions have priority over the Basic Provisions when a conflict exists, to any premium owed or indemnity or prevented planting payment made in accordance with the Crop Provisions, and any applicable endorsement.

    (2) Even if another person plants the second crop on any acreage where the first insured crop was planted or was prevented from being planted, as applicable.

    (3) For prevented planting only:

        (i) If a volunteer crop or cover crop is hayed or grazed from the same acreage, after the late planting period (or after the final planting date if a late planting period is not applicable) for the first insured crop in the same crop year, or is otherwise harvested anytime after the late planting period (or after the final planting date if a late planting period is not applicable); or

        (ii) If you receive cash rent for any acreage on which you were prevented from planting.

(g) You may receive a full indemnity, or a full prevented planting payment for a first insured crop when a second crop is planted on the same acreage in the same crop year, regardless of whether or not the second crop is insured or sustains an insurable loss, if each of the following conditions are met:

    (1) It is a practice that is generally recognized by agricultural experts or the organic agricultural industry for the area to plant two or more crops for harvest in the same crop year;

    (2) The second or more crops are customarily planted after the first insured crop for harvest on the same acreage in the same crop year in the area;

    (3) Additional coverage insurance offered under the authority of the Act is available in the county on the two or more crops that are double cropped;

    (4) You provide records acceptable to us of acreage and production that show you have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted, or that show the applicable acreage was double cropped in at least two of the last four crop years in which the first insured crop was grown on it; and

    (5) In the case of prevented planting, the second crop is not planted on or prior to the final planting date or, if applicable, prior to the end of the late planting period for the first insured crop.

(h) The receipt of a full indemnity or prevented planting payment on both crops that are double cropped is limited to the number of acres for which you can demonstrate you have double cropped or that have been historically double cropped as specified in section 16(g).

(i) If any Federal or State agency requires destruction of any insured crop or crop production, as applicable, because it contains levels of a substance, or has a condition, that is injurious to human or animal health in excess of the maximum amounts allowed by the Food and Drug Administration, other public health organizations of the United States or an agency of the applicable State, you must destroy the insured crop or crop production, as applicable, and certify that such insured crop or crop production has been destroyed prior to receiving an indemnity payment. Failure to destroy the insured crop or crop production, as applicable, will result in you having to repay any indemnity paid and you may be subject to administrative sanctions in accordance with section 515(h) of the Act and 7 CFR part 400, subpart R, and any applicable civil or criminal sanctions.

## 17. Late Planting

Unless limited by the Crop Provisions, insurance will be provided for acreage planted to the insured crop after the final planting date in accordance with the following:

(a) The per-acre revenue guarantee for each acre planted to the insured crop during the late planting period will be reduced by 1 percent per day for each day planted after the final planting date.

(b) Acreage planted after the late planting period (or after the final planting date for crops that do not have a late planting period) may be insured as follows:

    (1) The per-acre revenue guarantee for each acre planted as specified in this subsection will be determined by multiplying the per-acre revenue guarantee that is provided for acreage of the insured crop that is timely planted by the prevented planting coverage level percent you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

    (2) Planting on such acreage must have been prevented by the final planting date (or during the late planting period, if applicable) by an insurable cause occurring within the insurance period for prevented planting coverage; and

    (3) All production from insured acreage as specified in this section will be included as production to count for the unit.

(c) The premium amount for insurable acreage specified in this section will be the same as that for timely planted acreage. If the amount of premium you are required to pay (gross premium less our subsidy) for such acreage exceeds the liability, coverage for those acres will not be provided (no premium will be due and no indemnity will be paid).

(d) Any acreage on which an insured cause of loss is a material factor in preventing completion of planting, as specified in the definition of "planted acreage" (e.g.,

Exhibit to Complaint Page 19

0048

seed is broadcast on the soil surface but cannot be incorporated) will be considered as acreage planted after the final planting date and the per-acre revenue guarantee will be calculated in accordance with section 17(b)(1).

## 18. Prevented Planting

(a) Unless limited by the policy provisions, a prevented planting payment may be made to you for eligible acreage if: ·

  (1) You were prevented from planting the insured crop (Failure to plant when other producers in the area were planting will result in the denial of the prevented planting claim) by an insured cause that occurs:

    (i) On or after the sales closing date contained in the Special Provisions for the insured crop in the county for the crop year the application for insurance is accepted; or

    (ii) For any subsequent crop year, on or after the sales closing date for the previous crop year for the insured crop in the county, provided insurance has been in force continuously since that date (Cancellation for the purpose of transferring the policy to a different insurance provider for the subsequent crop year will not be considered a break in continuity for the purpose of the preceding sentence);

  (2) You include any acreage of the insured crop that was prevented from being planted on your acreage report; and

  (3) You did not plant the insured crop during or after the late planting period. If such acreage was planted to the insured crop during or after the late planting period, it is covered under the late planting provisions.

(b) The actuarial documents may contain additional levels of prevented planting coverage that you may purchase for the insured crop:

  (1) Such purchase must be made on or before the sales closing date;

  (2) If you do not purchase one of those additional levels by the sales closing date, you will receive the prevented planting coverage specified in the Crop Provisions;

  (3) If you have an MPCI Catastrophic Risk Protection Endorsement for any acreage of "high-risk land," the additional levels of prevented planting coverage will not be available for that acreage; and

  (4) You may not increase your elected or assigned preventing planting coverage level for any crop year if a cause of loss that will or could prevent planting is evident prior to the time you wish to change your prevented planting coverage level.

(c) The premium amount for acreage that is prevented from being planted will be the same as that for timely planted acreage except as specified in section 16(e). If the amount of premium you are required to pay (gross premium less our subsidy) for acreage that is prevented from being planted exceeds the liability on

such acreage, coverage for those acres will not be provided (no premium will be due and no indemnity will be paid for such acreage).

(d) Drought or failure of the irrigation water supply will be considered to be an insurable cause of loss for the purposes of prevented planting only if, on the final planting date (or within the late planting period if you elect to try to plant the crop):

  (1) For non-irrigated acreage, the area that is prevented from being planted has insufficient soil moisture for germination of seed or progress toward crop maturity due to a prolonged period of dry weather. Prolonged precipitation deficiencies must be verifiable using information collected by sources whose business it is to record and study the weather, including, but not limited to, local weather reporting stations of the National Weather Service; or

  (2) For irrigated acreage, there is not a reasonable expectation of having adequate water to carry out an irrigated practice. If you knew or had reason to know that your water is reduced before the final planting date, no reasonable expectation existed.

(e) The maximum number of acres that may be eligible for a prevented planting payment for any crop will be determined as follows:

  (1) The total number of acres eligible for prevented planting coverage for all crops cannot exceed the number of acres of cropland in your farming operation for the crop year, unless you are eligible for prevented planting coverage on double-cropped acreage in accordance with section 18(f)(4). The eligible acres for each insured crop will be determined in accordance with the following table.

**Exhibit to Complaint Page 20**

| Type of crop | Eligible acres if, in any of the 4 most recent crop years, you have planted any crop in the county for which prevented planting insurance was available or have received a prevented planting insurance guarantee | Eligible acres if, in any of the 4 most recent crop years, you have not planted any crop in the county for which prevented planting insurance was available or have not received a prevented planting insurance guarantee |
|---|---|---|
| (i) The crop is not required to be contracted with a processor to be insured | (A) The maximum number of acres certified for APH purposes or insured acres reported for insurance for the crop in any one of the 4 most recent crop years (not including reported prevented planting acreage that was planted to a second crop unless you meet the double cropping requirements in section 18(f)(4)). The number of acres determined above for a crop may be increased by multiplying it by the ratio of the total cropland acres that you are farming this year (if greater) to the total cropland acres that you farmed in the previous year, provided that you submit proof to us that for the current crop year you have purchased or leased additional land or that acreage will be released from any USDA program which prohibits harvest of a crop. Such acreage must have been purchased, leased, or released from the USDA program, in time to plant it for the current crop year using good farming practices. No cause of loss that would prevent planting may be evident at the time you lease the acreage (except acreage you leased the previous year and continue to lease in the current crop year); you buy the acreage; the acreage is released from a USDA program which prohibits harvest of a crop; you request a written agreement to insure the acreage; or you otherwise acquire the acreage (such as inherited or gifted acreage). | (B) The number of acres specified on your intended acreage report which is submitted to us by the sales closing date for all crops you insure for the crop year and that is accepted by us. The total number of acres listed may not exceed the number of acres of cropland in your farming operation at the time you submit the intended acreage report. The number of acres determined above for a crop may only be increased by multiplying it by the ratio of the total cropland acres that you are farming this year (if greater) to the number of acres listed on your intended acreage report, if you meet the conditions stated in section 18(e)(1)(i)(A). |
| (ii) The crop must be contracted with a processor to be insured | (A) The number of acres of the crop specified in the processor contract, if the contract specifies a number of acres contracted for the crop year; or the result of dividing the quantity of production stated in the processor contract by your approved yield, if the processor contract specifies a quantity of production that will be accepted. If a minimum number of acres or amount of production is specified in the processor contract, this amount will be used to determine the eligible acres. If a processor cancels or does not provide contracts, or reduces the contracted acreage or production from what would have otherwise been allowed, solely because the acreage was prevented from being planted due to an insured cause of loss, we may elect to determine the number of acres eligible based on the number of acres or amount of production you had contracted in the county in the previous crop year. If you did not have a processor contract in place for the previous crop year, you will not have any eligible prevented planting acreage for the applicable processor crop. The total eligible prevented planting acres in all counties cannot exceed the total number of acres or amount of production contracted in all counties in the previous crop year. | (B) The number of acres of the crop as determined in section 18(e)(1)(ii)(A). |

(2)    Any eligible acreage determined in accordance with the table contained in section 18(e)(1) will be reduced by subtracting the number of acres of the crop (insured and uninsured) that are timely and late planted, including acreage specified in section 17(b).

(f)  Regardless of the number of eligible acres determined in section 18(e), prevented planting coverage will not be provided for any acreage:

(1)    That does not constitute at least 20 acres or 20 percent of the insurable crop acreage in the unit, whichever is less, and any prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same crop, type, and practice that is planted in the field except that the prevented planting acreage may be considered to be acreage of a crop, type, and practice other than that which is planted in the field if:

(i)    The acreage that was prevented from being planted constitutes at least 20 acres or 20 percent of the total insurable acreage in the field and you produced both crops, crop types, or followed both practices in the same field in the same crop year within any

        05-RA (Ed. 08/30/04)

Exhibit to Complaint Page 21

0050

one of the four most recent crop years;

(ii) You were prevented from planting a first insured crop and you planted a second crop in the field (There can only be one first insured crop in a field unless the requirements in section 18(f)(1)(i) or (iii) are met); or

(iii) The insured crop planted in the field would not have been planted on the remaining prevented planting acreage (For example, where rotation requirements would not be met or you already planted the total number of acres specified in the processor contract);

(2) For which the actuarial documents do not provide the information needed to determine a premium rate unless a written agreement designates such premium rate;

(3) Used for conservation purposes, intended to be left unplanted under any program administered by the USDA or other government agency, or required to be left unharvested under the terms of the lease or any other agreement (The number of acres eligible for prevented planting will be limited to the number of acres specified in the lease for which you are required to pay either cash or share rent);

(4) On which the insured crop is prevented from being planted, if you or any other person receives a prevented planting payment for any crop for the same acreage in the same crop year (It is your responsibility to determine whether a prevented planting payment had previously been made for the crop year on the acreage for which you are now claiming a prevented planting payment and report such information to us before any prevented planting payment can be made), excluding share arrangements, unless:

(i) It is a practice that is generally recognized by agricultural experts or the organic agricultural industry in the area to plant the second crop for harvest following harvest of the first insured crop, and additional coverage insurance offered under the authority of the Act is available in the county for both crops in the same crop year;

(ii) You provide records acceptable to us of acreage and production that show you have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted, or that show the applicable acreage was double cropped in at least two of the last four crop years in which the first insured crop was grown on it; and

(iii) The amount of acreage you are double cropping in the current crop year does not exceed the number of acres for which you provide the records required in section 18(f)(4)(ii);

(5) On which the insured crop is prevented from being planted, if:

(i) Any crop is planted within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable, unless:
(A) You meet the double cropping requirements in section 18(f)(4);
(B) The crop planted was a cover crop; or
(C) No benefit, including any benefit under any USDA program, was derived from the crop; or

(ii) Any volunteer or cover crop is hayed, grazed or otherwise harvested within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable;

(6) For which planting history or conservation plans indicate that the acreage would remain fallow for crop rotation purposes or on which any pasture or other forage crop is in place on the acreage during the time that planting of the insured crop generally occurs in the area;

(7) That exceeds the number of acres eligible for a prevented planting payment;

(8) That exceeds the number of eligible acres physically available for planting;

(9) For which you cannot provide proof that you had the inputs available to plant and produce a crop with the expectation of at least producing the yield used to determine the per-acre revenue guarantee (Evidence that you have previously planted the crop on the unit will be considered adequate proof unless your planting practices or rotational requirements show that the acreage would have remained fallow or been planted to another crop);

(10) Based on an irrigated practice per-acre revenue guarantee unless adequate irrigation facilities were in place to carry out an irrigated practice on the acreage prior to the insured cause of loss that prevented you from planting (Acreage with an irrigated practice per-acre revenue guarantee will be limited to the number of acres allowed for that practice under sections 18(e) and (f));

(11) Based on a crop type that you did not plant, or did not receive a prevented planting insurance guarantee for, in at least one of the four most recent crop years.  Types for which separate prices or per-acre revenue guarantees are available must be included in your APH database in at least one of the four most recent crop years, or crops that do not require yield certification (crops for which the insurance guarantee is not based on APH) must be reported on your acreage report in at least one of the four most recent crop years except as allowed in section 18(e)(1)(i)(B).  We will limit prevented planting payments based on a specific crop type to the number of acres allowed for that crop type as specified in sections 18(e) and (f); or

(12) If a cause of loss has occurred that would prevent planting at the time:

**Exhibit to Complaint Page 22**

  (i) You lease the acreage (except acreage you leased the previous crop year and continue to lease in the current crop year);

  (ii) You buy the acreage;

  (iii) The acreage is released from a USDA program which prohibits harvest of a crop;

  (iv) You request a written agreement to insure the acreage; or

  (v) You acquire the acreage through means other than lease or purchase (such as inherited or gifted acreage).

(g) If you purchased a Revenue Assurance Policy for a crop, and you executed a High-Risk Land Exclusion Option that separately insures acreage which has been designated as "high-risk" land by FCIC under a Catastrophic Risk Protection Endorsement for that crop, the maximum number of acres eligible for a prevented planting payment will be limited for each policy as specified in sections 18 (e) and (f).

(h) If you are prevented from planting a crop for which you do not have an adequate base of eligible prevented planting acreage, as determined in accordance with section 18(e)(1), your prevented planting per-acre revenue guarantee, premium, and prevented planting payment will be based on the crops insured for the current crop year, for which you have remaining eligible prevented planting acreage. The crops used for this purpose will be those that result in a prevented planting payment most similar to the prevented planting payment that would have been made for the crop that was prevented from being planted.

  (1) For example, assume you were prevented from planting 200 acres of corn and have 100 acres eligible for a corn prevented planting guarantee that would result in a payment of $40 per acre. You also had 50 acres of potato eligibility that would result in a $100 per acre payment, 90 acres of grain sorghum eligibility that would result in a $30 per acre payment, and 100 acres of soybean eligibility that would result in a $25 per-acre payment. Your prevented planting coverage for the 200 acres would be based on 100 acres of corn ($40 per acre), 90 acres of grain sorghum ($30 per acre), and 10 acres of soybeans ($25 per acre).

  (2) Prevented planting coverage will be allowed as specified in section 18(h) only if the crop that was prevented from being planted meets all policy provisions, except for having an adequate base of eligible prevented planting acreage. Payment may be made based on crops other than those that were prevented from being planted even though other policy provisions, including but not limited to, processor contract and rotation requirements, have not been met for the crop on which payment is being based. However, if you were prevented from planting any non-irrigated crop acreage and you do not have any remaining eligible acreage for that crop and you do not have any other crop remaining with eligible acres under a non-irrigated practice, no prevented planting payment will be made for the acreage.

(i) The prevented planting payment for any eligible acreage within a basic or optional unit will be determined by:

  (1) Multiplying the per-acre revenue guarantee for timely planted acreage of the insured crop by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

  (2) Multiplying the result of section 18(i)(1) by the number of eligible prevented planting acres in the unit; and

  (3) Multiplying the result of section 18(i)(2) by your share.

(j) The prevented planting payment for any eligible acreage within an enterprise unit will be determined by:

  (1) Multiplying the per-acre revenue guarantee within the enterprise unit for timely planted acreage of the insured crop by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

  (2) Multiplying the result of section 18(j)(1) by the number of eligible prevented planting acres in the enterprise unit;

  (3) Totaling the results from section 18(j)(2); and

  (4) Multiplying the result of section 18(j)(3) by your share.

(k) The prevented planting payment for any eligible acreage within a whole-farm unit will be determined by:

  (1) Multiplying the per-acre revenue guarantee for the whole-farm unit for timely planted acreage of the insured crop by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

  (2) Multiplying the result of section 18(k)(1) by the number of eligible prevented planting acres in the whole-farm unit;

  (3) Totaling the results from section 18(k)(2); and

  (4) Multiplying the result of section 18(k)(3) by your share.

(l) When preliminary prevented planting payments are made before the fall harvest price is released, payments may need to be recalculated if the Fall Harvest Option was chosen by the sales closing deadline following the release of the fall harvest price.

**19. Crops As Payment**

  You must not abandon any crop to us. We will not accept any crop as compensation for payments due us.

**20. Mediation, Arbitration, Appeal, Reconsideration, and Administrative and Judicial Review**

  (a) If you and we fail to agree on any determination made by us except those specified in section 20(d), the disagreement may be resolved through mediation in accordance with section 20(g). If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be

resolved through arbitration in accordance with the rules of the American Arbitration Association (AAA), except as provided in sections 20(c) and (f), and unless rules are established by FCIC for this purpose. Any mediator or arbitrator with a familial, financial or other business relationship to you or us, or our agent or loss adjuster, is disqualified from hearing the dispute.

(1) All disputes involving determinations made by us, except those specified in section 20(d), are subject to mediation or arbitration. However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.

    (i) Any interpretation by FCIC will be binding in any mediation or arbitration.

    (ii) Failure to obtain any required interpretation from FCIC will result in the nullification of any agreement or award.

    (iii) An interpretation by FCIC of a policy provision is considered a rule of general applicability and is not appealable. If you disagree with an interpretation of a policy provision by FCIC, you must obtain a Director's review from the National Appeals Division in accordance with 7 CFR 11.6 before obtaining judicial review in accordance with subsection (e);

    (iv) An interpretation by FCIC of a procedure may be appealed to the National Appeals Division in accordance with 7 CFR part 11.

(2) Unless the dispute is resolved through mediation, the arbitrator must provide to you and us a written statement describing the issues in dispute, the factual findings, the determinations and the amount and basis for any award and breakdown by claim for any award. The statement must also include any amounts awarded for interest. Failure of the arbitrator to provide such written statement will result in the nullification of all determinations of the arbitrator. All agreements reached through settlement, including those resulting from mediation, must be in writing and contain at a minimum a statement of the issues in dispute and the amount of the settlement.

(b) Regardless of whether mediation is elected:

(1) The initiation of arbitration proceedings must occur within one year of the date we denied your claim or rendered the determination with which you disagree, whichever is later;

(2) If you fail to initiate arbitration in accordance with section 20(b)(1) and complete the process, you will not be able to resolve the dispute through judicial review;

(3) If arbitration has been initiated in accordance with section 20(b)(1) and completed, and judicial review is sought, suit must be filed not later than one year after the date the arbitration decision was rendered; and

(4) In any suit, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, an interpretation must be obtained from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC. Such interpretation will be binding.

(c) Any decision rendered in arbitration is binding on you and us unless judicial review is sought in accordance with section 20(b)(3). Notwithstanding any provision in the rules of the AAA, you and we have the right to judicial review of any decision rendered in arbitration.

(d) If you do not agree with any determination made by us or FCIC regarding whether you have used a good farming practice (excluding determinations by us of the amount of assigned production for uninsured causes for your failure to use good farming practices), you may request reconsideration by FCIC of this determination in accordance with the reconsideration process established for this purpose and published at 7 CFR part 400, subpart J (reconsideration). To resolve disputes regarding determinations of the amount of assigned production, you must use the arbitration or mediation process contained in this section.

(1) You must complete reconsideration before filing suit against FCIC and any such suit must be brought in the United States district court for the district in which the insured farm is located.

(2) Suit must be filed not later than one year after the date of the decision rendered in the reconsideration.

(3) You cannot sue us for determinations of whether good farming practices were used by you.

(e) Except as provided in section 20(d), if you disagree with any other determination made by FCIC, you may obtain an administrative review in accordance with 7 CFR part 400, subpart J (administrative review) or appeal in accordance with 7 CFR part 11 (appeal). If you elect to bring suit after completion of any appeal, such suit must be filed against FCIC not later than one year after the date of the decision rendered in such appeal. Under no circumstances can you recover any attorney fees or other expenses, or any punitive, compensatory or any other damages from FCIC.

(f) In any mediation, arbitration, appeal, administrative review, reconsideration or judicial process, the terms of this policy, the Act, and the regulations published at 7 CFR chapter IV, including the provisions of 7 CFR part 400, subpart P, are binding. Conflicts between this policy and any state or local laws will be resolved in accordance with section 31. If there are conflicts between any rules of the AAA and the provisions of your policy, the provisions of your policy will control.

(g) To resolve any dispute through mediation, you and we must both:

(1) Agree to mediate the dispute;

(2) Agree on a mediator; and

(3) Be present or have a designated representative

**Exhibit to Complaint Page 24**

who has authority to settle the case present, at the mediation.

(h) Except as provided in section 20(i), no award or settlement in mediation, arbitration, appeal, administrative review or reconsideration process or judicial review can exceed the amount of liability established or which should have been established under the policy, except for interest awarded in accordance with section 26.

(i) In a judicial review only, you may recover attorneys fees or other expenses, or any punitive, compensatory or any other damages from us only if you obtain a determination from FCIC that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled. Requests for such a determination should be addressed to the following:   USDA/RMA/Deputy Administrator of Compliance/Stop 0806, 1400 Independence Avenue, S.W., Washington D.C. 20250-0806.

(j) If FCIC elects to participate in the adjustment of your claim, or modifies, revises or corrects your claim, prior to payment, you may not bring an arbitration, mediation or litigation action against us. You must request administrative review or appeal in accordance with section 20(e).

21. **Access To Insured Crop and Records, and Record Retention**

(a) We, and any employee of USDA authorized to investigate or review any matter relating to crop insurance, have the right to examine the insured crop and all records related to the insured crop and any mediation, arbitration or litigation involving the insured crop as often as reasonably required during the record retention period.

(b) You must retain, and provide upon our request, or the request of any employee of USDA authorized to investigate or review any matter relating to crop insurance:

    (1) Complete records of the planting, replanting, inputs, production, harvesting, and disposition of the insured crop on each unit for three years after the end of the crop year (This requirement also applies to all such records for acreage that is not insured); and

    (2) All records used to establish the amount of production you certified on your production reports used to compute your approved yield for three years after the end of the crop year for which you initially certified such records, unless such records have already been provided to us (For example, if your approved yield for the 2003 crop year was based on production records you certified for the 1997 through 2002 crop years, you must retain all such records through the 2006 crop year, unless such records have already been provided to us).

(c) We, or any employee of USDA authorized to investigate or review any matter relating to crop insurance, may extend the record retention period

beyond three years by notifying you of such extension in writing.

(d) By signing the application for insurance authorized under the Act or by continuing insurance for which you have previously applied, you authorize us or USDA, or any person acting for us or USDA authorized to investigate or review any matter relating to crop insurance, to obtain records relating to the planting, replanting, inputs, production, harvesting, and disposition of the insured crop from any person who may have custody of such records, including but not limited to, FSA offices, banks, warehouses, gins, cooperatives, marketing associations, and accountants. You must assist in obtaining all records we or any employee of USDA authorized to investigate or review any matter relating to crop insurance request from third parties.

(e) Failure to provide access to the insured crop or the farm, authorize access to the records maintained by third parties or assist in obtaining such records will result in a determination that no indemnity is due for the crop year in which such failure occurred.

(f) Failure to maintain or provide records will result in:

    (1) The imposition of an assigned yield in accordance with section 4(e)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have the required production records to support a certified yield;

    (2) A determination that no indemnity is due if you fail to provide records necessary to determine your loss;

    (3) Combination of the optional units into the applicable basic unit;

    (4) Assignment of production to the units by us if you fail to maintain separate records:

        (i) For your basic units; or

        (ii) For any uninsurable acreage; and

    (5) The imposition of consequences specified in section 7(g), as applicable.

(g) If the imposition of an assigned yield under section 21(f)(1) would affect an indemnity, prevented planting payment or replant payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

22. **Other Insurance**

(a) **Other Like Insurance** - Nothing in this section prevents you from obtaining other insurance not authorized under the Act.   However, unless specifically required by policy provisions, you must not obtain any other crop insurance authorized under the Act on your share of the insured crop.  If you cannot demonstrate that you did not intend to have more than one policy in effect, you may be subject to the consequences authorized under this policy, the Act, or any other applicable statute.  If you can demonstrate that you did not intend to have more than one policy in effect (For example, an application to transfer your policy or written notification to an insurance provider that states you want to purchase, or transfer, insurance and you want any other policies for the crop canceled would demonstrate you did not intend to have duplicate policies), and:

**Exhibit to Complaint Page 25**

**0054**

(1) One is an additional coverage policy and the other is a Catastrophic Risk Protection policy:
    (i) The additional coverage policy will apply if both policies are with the same insurance provider or, if not, both insurance providers agree; or
    (ii) The policy with the earliest date of application will be in force if both insurance providers do not agree; or
(2) Both are additional coverage policies or both are Catastrophic Risk Protection policies, the policy with the earliest date of application will be in force and the other policy will be void, unless both policies are with:
    (i) The same insurance provider and the insurance provider agrees otherwise; or
    (ii) Different insurance providers and both insurance providers agree otherwise.

(b) **Other Insurance Against Fire** - If you have other insurance, whether valid or not, against damage to the insured crop by fire during the insurance period, we will be liable for loss due to fire caused by a naturally occurring event only for the smaller of:
(1) The amount of indemnity determined pursuant to this policy without regard to such other insurance; or
(2) The amount by which the loss from fire is determined to exceed the indemnity paid or payable under such other insurance.

(c) For the purpose of section 22(b), the amount of loss from fire will be the reduction in revenue of the insured crop on the unit involved determined pursuant to this policy.

### 23. Conformity To Food Security Act
Although your violation of any number of federal statutes, including the Act, may cause cancellation, termination, or voidance of your insurance contract, you should be specifically aware that your policy can be canceled if you are determined to be ineligible to receive benefits under the Act due to violation of the controlled substance provisions (title XVII) of the Food Security Act of 1985 (Pub. L. 99-198) and the regulations published at 7 CFR part 400, subpart F. Your insurance policy will be canceled if you are determined, by the appropriate Agency, to be in violation of these provisions. We will recover any and all monies paid to you or received by you during your period of ineligibility, and your premium will be refunded, less a reasonable amount for expenses and handling not to exceed 20 percent of the premium paid or to be paid by you.

### 24. Amounts Due Us
(a) Interest will accrue at the rate of 1.25 percent simple interest per calendar month, or any portion thereof, on any unpaid amount owed to us or on any unpaid administrative fees owed to FCIC. For the purpose of premium amounts owed to us or administrative fees owed to FCIC, interest will start to accrue on the first day of the month following the premium billing date specified in the Special Provisions. We will collect any unpaid amounts owed to us and any interest owed thereon and, prior to the termination date, we will collect any administrative fees and interest owed

thereon to FCIC. After the termination date, FCIC will collect any unpaid administrative fees and any interest owed thereon.

(b) For the purpose of any other amounts due us, such as repayment of indemnities found not to have been earned, interest will start to accrue on the date that notice is issued to you for the collection of the unearned amount. Amounts found due under this paragraph will not be charged interest if payment is made within 30 days of issuance of the notice by us. The amount will be considered delinquent if not paid within 30 days of the date the notice is issued by us.

(c) All amounts paid will be applied first to expenses of collection (see section 24(d)) if any, second, to the reduction of accrued interest, and then to the reduction of the principal balance.

(d) If we determine that it is necessary to contract with a collection agency or to employ an attorney to assist in collection, you agree to pay all of the expenses of collection.

(e) The portion of the amounts owed by you for a policy authorized under the Act that are owed to FCIC may be collected in part through administrative offset from payments you receive from United States government agencies in accordance with 31 U.S.C. chapter 37. Such amounts include all administrative fees, and the share of the overpaid indemnities and premiums retained by FCIC plus any interest owed thereon.

### 25. [Reserved]

### 26. Interest Limitations
We will pay simple interest computed on the net indemnity ultimately found to be due by us or by a final judgment of a court of competent jurisdiction, from and including the 61st day after the date you sign, date, and submit to us the properly completed claim on our form. Interest will be paid only if the reason for our failure to timely pay is **NOT** due to your failure to provide information or other material necessary for the computation or payment of the indemnity. The interest rate will be that established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) and published in the Federal Register semiannually on or about January 1 and July 1 of each year, and may vary with each publication.

### 27. Concealment, Misrepresentation or Fraud
(a) If you have falsely or fraudulently concealed the fact that you are ineligible to receive benefits under the Act or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy:
(1) This policy will be voided; and
(2) You may be subject to remedial sanctions in accordance with 7 CFR part 400, subpart R.

(b) Even though the policy is void, you may still be required to pay 20 percent of the premium due under the policy to offset costs incurred by us in the service of this policy. If previously paid, the balance of the premium will be returned.

(c) Voidance of this policy will result in you having to reimburse all indemnities paid for the crop year in which the voidance was effective.

(d) Voidance will be effective on the first day of the

**Exhibit to Complaint Page 26**

**0055**

insurance period for the crop year in which the act occurred and will not affect the policy for subsequent crop years unless a violation of this section also occurred in such crop years.

**28. Transfer of Coverage and Right to Indemnity**

If you transfer any part of your share during the crop year, you may transfer your coverage rights, if the transferee is eligible for crop insurance. We will not be liable for any more than the liability determined in accordance with your policy that existed before the transfer occurred. The transfer of coverage rights must be on our form and will not be effective until approved by us in writing. Both you and the transferee are jointly and severally liable for the payment of the premium and administrative fees. The transferee has all rights and responsibilities under this policy consistent with the transferee's interest.

**29. Assignment of Indemnity**

You may assign to another party your right to an indemnity for the crop year. The assignment must be on our form and will not be effective until approved in writing by us. The assignee will have the right to submit all loss notices and forms as required by the policy. If you have suffered a loss from an insurable cause and fail to file a claim for indemnity within 60 days after the fall harvest price is released, the assignee may submit the claim for indemnity not later than 15 days after the 60-day period has expired. We will honor the terms of the assignment only if we can accurately determine the amount of the claim. However, no action will lie against us for failure to do so.

**30. Subrogation (Recovery of Loss from a Third Party)**

Since you may be able to recover all or a part of your loss from someone other than us, you must do all you can to preserve this right. If you receive any compensation for your loss, excluding private hail insurance payments and payments covered by section 34, and the indemnity due under this policy plus the amount you receive from the person exceeds the amount of your actual loss, the indemnity will be reduced by the excess amount, or if the indemnity has already been paid you will be required to repay the excess amount, not to exceed the amount of the indemnity. The total amount of the actual loss is the difference between the value of the insured crop before and after the loss, based on your production records and the fall harvest price available for the crop. If we pay you for your loss, your right to recovery will, at our option, belong to us. If we recover more than we paid you plus our expenses, the excess will be paid to you.

**31. Applicability of State and Local Statutes**

If the provisions of this policy conflict with statutes of the State or locality in which this policy is issued, the policy provisions will prevail. State and local laws and regulations in conflict with federal statutes, this policy, and the applicable regulations do not apply to this policy.

**32. Descriptive Headings**

The descriptive headings of the various policy provisions are formulated for convenience only and are not intended to affect the construction or meaning of any of the policy provisions.

**33. Notices**

(a) All notices required to be given by you must be in writing and received by your crop insurance agent

within the designated time unless otherwise provided by the notice requirement. Notices required to be given immediately may be by telephone or in person and confirmed in writing. Time of the notice will be determined by the time of our receipt of the written notice. If the date by which you are required to submit a report or notice falls on Saturday, Sunday, or a Federal holiday, or if your agent's office is, for any reason, not open for business on the date you are required to submit such notice or report, such notice or report must be submitted on the next business day.

(b) All notices and communications required to be sent by us to you will be mailed to the address contained in your records located with your crop insurance agent. Notice sent to such address will be conclusively presumed to have been received by you. You should advise us immediately of any change of address.

**34. Multiple Benefits**

(a) If you are eligible to receive an indemnity under an additional coverage plan of insurance and are also eligible to receive benefits for the same loss under any other USDA program, you may receive benefits under both programs, unless specifically limited by the crop insurance contract or by law.

(b) The total amount received from all such sources may not exceed the amount of your actual loss. The total amount of the actual loss is the difference between the fair market value of the insured commodity before and after the loss, based on your production records and the price available for the crop.

(c) FSA will determine and pay the additional amount due you for any applicable USDA program, after first considering the amount of any crop insurance indemnity.

**35. Written Agreements**

Only rates of premium for this policy may be altered by written agreement in accordance with the following:

(a) You must apply in writing for each written agreement no later than the sales closing date, except as provided in section 35(e);

(b) The application for a written agreement must contain the rate of premium applicable to this policy that will be in effect if the written agreement rate is not approved;

(c) If approved by FCIC, the written agreement will include all terms of the contract, including, but not limited to, crop practice, type or variety, the guarantee (except for a written agreement in effect for more than one year) and premium rate or information needed to determine the guarantee and premium rate;

(d) Each written agreement will only be valid for the number of crop years specified in the written agreement and a multi-year written agreement:

(1) Will only apply for any particular crop year designated in the written agreement if all terms and conditions in the written agreement are still applicable for the crop year and the conditions under which the written agreement has been provided have not changed prior to the beginning of the insurance period (If conditions change during or prior to the crop year, the written agreement will not be effective for that crop year

**Exhibit to Complaint Page 27**

but may still be effective for a subsequent crop year if conditions under which the written agreement has been provided exist for such year);

(2) May be canceled in writing by:
   (i) FCIC not less than 30 days before the cancellation date if it discovers that any term or condition of the written agreement, including the premium rate, is not appropriate for the crop; or
   (ii) You or us on or before the cancellation date;

(3) That is not renewed in writing after it expires, is not applicable for a crop year, or is canceled, then insurance coverage will be in accordance with the terms and conditions stated in this policy, without regard to the written agreement; and

(4) Will be automatically cancelled if you transfer your policy to another insurance provider (No notice will be provided to you and for any subsequent crop year, for a written agreement to be effective, you must timely request renewal of the written agreement in accordance with this section);

(e) A request for a written agreement may be submitted:

(1) After the sales closing date, but on or before the acreage reporting date, if you demonstrate your physical inability to submit the request prior to the sales closing date (For example, you have been hospitalized or a blizzard has made it impossible to submit the written agreement request in person or by mail);

(2) For the first year the written agreement will be in effect only:
   (i) On or before the acreage reporting date, to:
      (A) Insure unrated land (Such written agreements may be approved only after inspection of the acreage by us and the written agreement may only be approved by FCIC if the crop's potential is equal to or exceeds 90 percent of the yield used to determine the revenue guarantee and you sign the agreement on the same day the appraisal is made); or
      (B) Change the premium rate for designated high risk land; or
   (ii) On or before the date specified in the Crop Provisions or Special Provisions;

(3) On or before the sales closing date, for all requests for renewal of written agreements, except as provided in section 35(e)(1);

(4) To add land to an existing written agreement or to add land to a request for a written agreement provided the request is submitted by the deadlines specified in this subsection;

(f) A request for a written agreement must contain:

(1) For all written agreement requests:
   (i) A completed "Request for Actuarial Change" form;
   (ii) An APH form (except for policies that do not require APH) containing all the information needed to determine the approved yield for the current crop year (completed APH form),

signed by you, or an unsigned, completed APH form with the applicable production reports signed and dated by you that are based on verifiable records of actual yields for the crop and county for which the written agreement is being requested (the actual yields do not necessarily have to be from the same physical acreage for which you are requesting a written agreement) for at least the most recent crop year during the base period and verifiable records of actual yields if required by FCIC;

   (iii) The legal description of the land (in areas where legal descriptions are available), FSA Farm Serial Number including tract number, and a FSA aerial photograph, acceptable Geographic Information System or Global Positioning System maps or other legible maps delineating field boundaries where you intend to plant the crop for which insurance is requested; and

   (iv) All other information that supports your request for a written agreement (including but not limited to records pertaining to levees, drainage systems, flood frequency data, soil types, elevation, etc.); and

(2) Such other information as specified in the Special Provisions or required by FCIC;

(g) A request for a written agreement will not be accepted if:

(1) The request is submitted to us after the deadline contained in sections 35(a) or (e);

(2) All the information required in section 35(f) is not submitted to us with the request for a written agreement (The request for a written agreement may be accepted if any missing information is available from other acceptable sources); or

(3) The request is to add land to an existing written agreement or to add land to a request for a written agreement and the request to add the land is not submitted by the deadlines specified in sections 35(a) or (e).

(h) A request for a written agreement will be denied if:

(1) FCIC determines the risk is excessive;

(2) Your APH history demonstrates you have not produced at least 50 percent of the transitional yield for the crop, type, and practice obtained from a county with similar agronomic conditions and risk exposure; or

(3) There is not adequate information available to establish an actuarially sound premium rate and insurance coverage for the crop and acreage;

(i) A written agreement will be denied unless:

(1) FCIC approves the written agreement;

(2) The original written agreement is signed by you and sent to us not later than the expiration date; and

(3) The crop meets the minimum appraisal amount specified in section 35(e)(2)(i)(A), if applicable;

(j) Multiyear written agreements may be canceled and requests for renewal may be rejected if the severity or frequency of your loss experience under the written

agreement is significantly worse than expected based on the information provided by you or used to establish your premium rate and the loss experience of other crops with similar risks in the area;

(k) With respect to your and our ability to reject an offer for a written agreement:

(1) When a single Request for Actuarial Change form is submitted, regardless of how many requests for changes are contained on the form, you and we can only accept or reject the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

(2) When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, for the same condition or for the same crop (*i.e.*, the request is to change the premium rates from the high risk rates) all these forms may be treated as one request and you and we will only have the option of accepting or rejecting the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

(3) When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, separate agreements may be issued and you and we will have the option to accept or reject each written agreement; and

(4) If we reject an offer for a written agreement approved by FCIC, you may seek arbitration or mediation of our decision to reject the offer in accordance with section 20;

(l) Any information that is submitted by you after the applicable deadlines in sections 35(a) and (e) will not be considered, unless such information is specifically requested in accordance with section 35(f)(3);

(m) If the written agreement or the policy is canceled for any reason, or the period for which an existing written agreement is in effect ends, a request for renewal of the written agreement must contain all the information required by this section and be submitted in accordance with section 35(e), unless otherwise specified by FCIC; and

(n) If a request for a written agreement is not approved by FCIC, a request for a written agreement for any subsequent crop year that fails to address the stated basis for the denial will not be accepted (If the request for a written agreement contains the same information that was previously rejected or denied, you will not have any right to arbitrate, mediate or appeal the non-acceptance of your request).

## 36. Substitution of Yields

(a) When you have actual yields in your production history database that, due to an insurable cause of loss, are less than 60 percent of the applicable transitional yield (T-yield) you may elect, on an individual actual yield basis, to exclude and replace one or more of any such yields within each database.

(b) Each election made in section 36(a) must be made on or before the production reporting date for the insured crop and each such election will remain in effect for succeeding years unless cancelled by the production

reporting date for the succeeding crop year. If you cancel an election, the actual yield will be used in the database. For example, if you elected to substitute yields in your database for the 1998 and 2000 crop year, for any subsequent crop year, you can elect to cancel the substitution for either or both years.

(c) Each excluded actual yield will be replaced with a yield equal to 60 percent of the applicable T-yield for the crop year in which the yield is being replaced (For example, if you elect to exclude a 2001 crop year actual yield, the T-yield in effect for the 2001 crop year in the county will be used. If you also elect to exclude a 2002 crop year actual yield, the T-yield in effect for the 2002 crop year in the county will be used). The replacement yields will be used in the same manner as actual yields for the purpose of calculating the approved yield.

(d) Once you have elected to exclude an actual yield from the database, the replacement yield will remain in effect until such time as that crop year is no longer included in the database unless this election is cancelled in accordance with section 36(b).

(e) Although your approved yield will be used to determine your amount of premium owed, the premium rate will be increased to cover the additional risk associated with the substitution of higher yields.

## 37. Organic Farming Practices

(a) In accordance with section 9(b)(2), insurance will not be provided for any crop grown using an organic farming practice, unless the information needed to determine a premium rate for an organic farming practice is specified on the actuarial table.

(b) If insurance is provided for an organic farming practice as specified in section 37(a), only the following acreage will be insured under such practice:

(1) Certified organic acreage;

(2) Transitional acreage being converted to certified organic acreage in accordance with an organic plan; and

(3) Buffer zone acreage.

(c) On the date you report your acreage, you must have:

(1) For certified organic acreage, a written certification in effect from a certifying agent indicating the name of the entity certified, effective date of certification, certificate number, types of commodities certified, and name and address of the certifying agent (A certificate issued to a tenant may be used to qualify a landlord or other similar arrangement);

(2) For transitional acreage, a certificate as described in section 37(c)(1), or written documentation from a certifying agent indicating an organic plan is in effect for the acreage; and

(3) Records from the certifying agent showing the specific location of each field of certified organic, transitional, buffer zone, and acreage not maintained under organic management.

(d) If you claim a loss on any acreage insured under an organic farming practice, you must provide us with copies of the records required in section 37(c).

**Exhibit to Complaint Page 29**

(e)   If any acreage qualifies as certified organic or transitional acreage on the date you report such acreage, and such certification is subsequently revoked by the certifying agent, or the certifying agent no longer considers the acreage as transitional acreage for the remainder of the crop year, that acreage will remain insured under the reported practice for which it qualified at the time the acreage was reported.  Any loss due to failure to comply with organic standards will be considered an uninsured cause of loss.

(f)   Contamination by application or drift of prohibited substances onto land on which crops are grown using organic farming practices will not be an insured peril on any certified organic, transitional or buffer zone acreage.

(g)   In addition to the provisions contained in section 18(f), prevented planting coverage will not be provided for any acreage based on an organic farming practice in excess of the number of acres that will be grown under an organic farming practice and shown as such in the records required in section 37(c).

(h)   In lieu of the provisions contained in section 18(f)(1) that specify prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same practice that is planted in the field, prevented planting acreage will be considered as organic practice acreage if it is identified as certified organic, transitional, or buffer zone acreage in the organic plan.

05-RA (Ed. 08/30/04)

**Exhibit to Complaint Page 30**

# REVENUE ASSURANCE
# RICE CROP PROVISIONS

This risk management tool will be reinsured under the authority provided by the Federal Crop Insurance Act as amended. If a conflict exists among the policy provisions, the order of priority is as follows: (1) the Special Provisions; (2) these Crop Provisions; and (3) the Basic Provisions with (1) controlling (2), etc.

1. **Definitions**

**CBOT** - Chicago Board of Trade.

**Fall harvest price** - The price used to value production to count. For rice the fall harvest price is the October harvest year's average daily settlement price per pound for the harvest year's CBOT November rough rice futures contract rounded to the nearest one-tenth (1/10th) of a cent. The fall harvest price will be released by November 10 of the harvest year.

**Fall harvest price option** - A coverage option that allows you to use the greater of the projected harvest price or the fall harvest price to determine your per acre revenue guarantee. For basic, optional, and enterprise units, this option applies to all insurable acres of a crop in the county. For the whole-farm unit, this option will apply to all insurable acres of the applicable crops in the county. This option must be selected by the sales closing date and is continuous unless canceled by the crop sales closing date.

**Flood irrigation** - An irrigated practice commonly used for rice production whereby the planted acreage is intentionally covered with water that is maintained at a uniform and shallow depth throughout the growing season.

**Harvest** - Combining or threshing the rice for grain. A crop that is swathed prior to combining is not considered harvested.

**Local market price** - The cash price per pound for the U.S. No. 3 grade of rough rice offered by buyers in the area in which you normally market the rice. Factors not associated with grading under the United States Standards for Rice including, but not limited to, protein and oil content or milling quality will not be considered.

**Planted** - The uniform placement of an adequate amount of rice seed into a prepared seedbed by one of the following methods:

(a) Drill seeding - Using a grain drill to incorporate the seed to a proper soil depth;

(b) Broadcast seeding - Distributing seed evenly onto the surface of an un-flooded seedbed followed by either timely mechanical incorporation of the seed to a proper soil depth in the seedbed or flushing the seedbed with water; or

(c) Broadcast seeding into a controlled flood - Distributing the rice seed onto a prepared seedbed that has been intentionally covered to a proper depth by water. The water must be free of movement and be completely contained on the acreage by properly constructed levees and gates.

Acreage seeded in any other manner will not be insurable unless otherwise provided by the Special Provisions.

**Prevented planting guarantee** - The prevented planting guarantee for such acreage will be the selected percentage of the per-acre revenue guarantee for timely planted acres as set forth in section 13.

**Projected harvest price** - The price used to determine the expected per-acre revenue and calculate premium. For rice the projected harvest price is the January harvest year's average daily settlement price per pound for the harvest year's CBOT November rough rice futures contract rounded to the nearest one-tenth (1/10th) of a cent. The projected price will be released by February 10 of the harvest year.

**Saline water** - Water that contains a concentration of salt sufficient to cause damage to the insured crop.

**Second crop rice** - The regrowth of a stand of rice following harvest of the initially insured rice crop that can be harvested in the same crop year.

**Swathed** - Severance of the stem and grain head from the ground without removal of the rice kernels from the plant and placing in a windrow.

**Total milling yield** - Rice production consisting of heads, second heads, screenings, and brewer's rice as defined by the official United States Standards for Rice.

2. **Unit Structure.**

Provisions in the Basic Provisions that allow optional units by irrigated and non-irrigated practices are not applicable.

3. **Contract Changes**

In accordance with section 5 of the Basic Provisions, the contract change date is November 30 preceding the cancellation date.

4. **Cancellation and Termination Dates**

The cancellation and termination date is February 28.

5. **Annual Premium**

In addition to the provisions of section 8 of the Basic Provisions, your per-acre premium on a unit is determined using the premium calculator. Your per-acre premiums will differ by crop and unit structure.

(a) Basic unit: The annual premium for a basic unit equals the per-acre premium, times the number of insured acres in the unit, times your share.

(b) Optional unit: The annual premium for an optional unit equals the per-acre premium, times an optional unit surcharge factor, times the number of insured acres in the optional unit, times your share. The optional unit surcharge factor is 1.10.

(c) Enterprise unit: The annual premium for an enterprise unit equals the per-acre premium, times the number of insured acres in the unit, times your share. The per-acre premium decreases as the number of legally defined sections on which you have insured acreage increases up to a maximum of 10 sections.

(d) Whole-farm unit: The annual premium for a whole-farm unit equals the per-acre premium, times the number of insured acres in the unit, times your share. The insured per-acre premium decreases as the number of legally defined sections on which you have insured acreage increases up to a maximum of 10 sections. The per-acre premium also depends on the proportions of

insured crop acres on the unit. For example, if the unit contains corn, soybeans, and rice, the per-acre premium will depend on the ratio of corn to soybean insured acres, the ratio of corn to rice insured acres, and the ratio of soybean to rice insured acres.

6. **Insured Crop.**

In accordance with section 9 of the Basic Provisions, the crop insured will be all the rice in the county for which a premium rate is provided by the actuarial documents:
(a) In which you have a share;
(b) That is planted for harvest as grain;
(c) That is flood irrigated; and
(d) That is not wild rice.

7. **Insurable Acreage.**

In addition to the provisions of section 10 of the Basic Provisions:
(a) We will not insure any acreage planted to rice:
(1) The preceding crop year unless allowed by the Special Provisions; or
(2) That does not meet the rotation requirements shown in the Special Provisions; and
(b) Any acreage of the insured crop damaged before the final planting date, to the extent that producers in the area would normally not further care for the crop, must be replanted unless we agree that it is not practical to replant.

8. **Insurance Period.**

In accordance with the provisions of section 12 of the Basic Provisions, the calendar date for the end of the insurance period is October 31 immediately following planting.

9. **Causes of Loss.**

(a) In accordance with the provisions of section 13 of the Basic Provisions, insurance is provided only against the following causes of loss that occur during the insurance period:
(1) Adverse weather conditions (except drought);
(2) Fire;
(3) Insects, but not damage due to insufficient or improper application of pest control measures;
(4) Plant disease, but not damage due to insufficient or improper application of disease control measures;
(5) Wildlife;
(6) Earthquake;
(7) Volcanic eruption; or
(8) Failure of the irrigation water supply if caused by an insured cause of loss specified in sections 9(a)(1) through (7), drought, or the intrusion of saline water.
(9) A decline in the fall harvest price below the projected harvest price
(b) In addition to the causes of loss not insured against in section 13 of the Basic Provisions, we will not insure against any loss of production due to the application of saline water, except as specified in section 9(a)(8) of these crop provisions.

10. **Replanting Payment.**

(a) A replanting payment for rice is allowed as follows:
(1) You must comply with all requirements regarding replanting payments contained under section 14 of the Basic Provisions;
(2) The rice must be damaged by an insurable cause of loss to the extent that the remaining stand will not

produce at least 90 percent of the revenue guarantee for the acreage; and
(3) The replanted rice must be seeded at a rate that is normal for initially planted rice (if new seed is planted at a reduced seeding rate into a partially damaged stand of rice, the acreage will not be eligible for a replanting payment).
(b) In accordance with the provisions of section 14 of the Basic Provisions, the maximum amount of the replanting payment per acre will be the lesser of 20 percent of the revenue guarantee or 400 pounds, multiplied by the projected harvest price, multiplied by your insured share.
(c) When rice is replanted using a practice that is uninsurable for an original planting, the liability for the unit will be reduced by the amount of the replanting payment. The premium amount will not be reduced.

11. **Duties in the Event of Damage or Loss.**

In accordance with the requirements of section 15 of the Basic Provisions, the representative samples of the unharvested crop must be at least 10 feet wide and extend the entire length of each field in the unit. The samples must not be harvested or destroyed until the earlier of our inspection or 15 days after harvest of the balance of the unit is completed.

12. **Final Settlement of Claim**

(a) We will determine your loss on a unit basis. In the event you are unable to provide separate acceptable production records:
(1) For any optional units, we will combine all optional units for which such production records were not provided; or
(2) For any basic units, we will allocate any commingled production to such units in proportion to our liability on the harvested acreage for each unit.
(b) In the event of loss or damage covered by this policy, we will settle your claim using the following procedures:
(1) Basic and Optional units: We will settle your claim on each basic or optional unit by:
(i) Multiplying the unit's per-acre revenue guarantee by the number of insured acres in the unit;
(ii) Multiplying the fall harvest price by the production to count for each unit (see sections 12(c) through (e);
(iii) Subtracting the result of section 12(b)(1)(ii) from the result of section 12(b)(1)(i); and
(iv) Multiplying the results of section 12(b)(1)(iii) by your share.
If the result of section 12(b)(1)(iv) is greater than zero, an indemnity equal to that result will be paid to you. If the result of section 12(b)(1)(iv) is less than or equal to zero, no indemnity will be paid.
(2) Enterprise units: We will settle your claim on an enterprise unit by:
(i) Multiplying the enterprise unit's per-acre revenue guarantee by the number of insured acres in the enterprise unit;
(ii) Multiplying the fall harvest price by the production to count for the enterprise unit;
(iii) Subtracting the result of section 12(b)(2)(ii)

**Exhibit to Complaint Page 32**

from the result of section 12(b)(2)(i); and

(iv) Multiplying the result of section 12(b)(2)(iii) by your share.

If the result of section 12(b)(2)(iv) is greater than zero, an indemnity equal to that result will be paid to you. If the result is less than or equal to zero, no indemnity will be paid.

(3) Whole-farm units: We will settle your claim on a whole-farm unit by:

(i) Multiplying the per acre revenue guarantee for each crop by the number of insured acres planted to each crop;

(ii) Totaling the results of section 12(b)(3)(i);

(iii) Multiplying the fall harvest price for each crop by the production to count for each crop;

(iv) Totaling the results of section 12(b)(3)(iii);

(v) Subtracting the result of section 12(b)(3)(iv) from the result of section 12(b)(3)(ii); and

(vi) Multiplying the result of section 12(b)(3)(v) by your share.

If the result of section 12(b)(3)(vi) is greater than zero, an indemnity equal to that result will be paid to you. If the result is less than or equal to zero, no indemnity will be paid.

(c) The total production to count (in pounds) from all insurable acreage on the unit will include:

(1) All appraised production as follows:

(i) Not less than the amount of production that when multiplied by the fall harvest price equals the revenue guarantee for acreage:

(A) That is abandoned;

(B) Put to another use without our consent;

(C) That is damaged solely by uninsured causes; or

(D) For which you fail to provide acceptable production records;

(ii) Production lost due to uninsured causes;

(iii) Unharvested production (mature unharvested production may be adjusted for quality deficiencies and excess moisture in accordance with section 12(d));

(iv) Potential production on insured acreage that you intend to put to another use or abandon, if you and we agree on the appraised amount of production. Upon such agreement, the insurance period for that acreage will end when you put the acreage to another use or abandon the crop. If agreement on the appraised amount of production is not reached:

(A) If you do not elect to continue to care for the crop, we may give you consent to put the acreage to another use if you agree to leave intact, and provide sufficient care for, representative samples of the crop in locations acceptable to us (The amount of production to count for such acreage will be based on the harvested production or appraisals from the samples at the time harvest should have occurred. If you do not leave the required samples intact, or you fail to provide sufficient care for the

samples, our appraisal made prior to giving you consent to put the acreage to another use will be used to determine the amount of production to count); or

(B) If you elect to continue to care for the crop, the amount of production to count for the acreage will be the harvested production, or our reappraisal if additional damage occurs and the crop is not harvested; and

(2) All harvested production from the insurable acreage, including any production from a second rice crop harvested in the same crop year.

(d) Mature rough rice may be adjusted for excess moisture and quality deficiencies. If moisture adjustment is applicable, it will be made prior to any adjustment for quality.

(1) Production will be reduced by 0.12 percent for each 0.1 percentage point of moisture in excess of 12 percent. We may obtain samples of the production to determine the moisture content.

(2) Production will be eligible for quality adjustment if:

(i) Deficiencies in quality, in accordance with the Official United States Standards for Rice, result in rice not meeting the grade requirements for U.S. No. 3 (grades U.S. No. 4 or worse) because of red rice, chalky kernels or damaged kernels;

(ii) The rice has a total milling yield of less than 68 pounds per hundredweight;

(iii) The whole kernel weight is less than 55 pounds per hundredweight of milled rice for medium and short grain varieties;

(iv) The whole kernel weight is less than 48 pounds per hundredweight of milled rice for long grain varieties; or

(v) Substances or conditions are present that are identified by the Food and Drug Administration or other public health organizations of the United States as being injurious to human or animal health.

(3) Quality will be a factor in determining your loss only if:

(i) The deficiencies, substances, or conditions specified in section 12(d)(2) resulted from a cause of loss against which insurance is provided under these crop provisions and which occurs within the insurance period;

(ii) The deficiencies, substances, or conditions specified in section 12(d)(2) result in a net price for the damaged production that is less than the local market price;

(iii) All determinations of these deficiencies, substances, or conditions specified in section 12(d)(2) are made using samples of the production obtained by us or by a disinterested third party approved by us;

(iv) With regard to deficiencies in quality (except test weight, which may be determined by our loss adjustor), the samples are analyzed by:

**Exhibit to Complaint Page 33**

03-RA RICE (09/24/02)

(A) A grader licensed under the United States Agricultural Marketing Act or the United States Warehouse Act;

(B) A grader licensed under State law and employed by a warehouse operator who has a storage agreement with the Commodity Credit Corporation; or

(C) A grader not licensed under State law, but who is employed by a warehouse operator who has a commodity storage agreement with the Commodity Credit Corporation and is in compliance with State law regarding warehouses; and

(v) With regard to substances or conditions injurious to human or animal health, the samples are analyzed by a laboratory approved by us.

(4) Rice production that is eligible for quality adjustment, as specified in sections 12(d)(2) and (3), will be reduced as follows:

(i) In accordance with quality adjustment factors contained in the Special Provisions; or

(ii) If quality adjustment factors are not contained in the Special Provisions, as follows:

(A) The market price of the qualifying damaged production and the local market price will be determined on the earlier of the date such quality adjusted production is sold or the date of final inspection for the unit. The price for the qualifying damaged production will be the market price for the local area to the extent feasible. Discounts used to establish the net price of the damaged production will be limited to those that are usual, customary, and reasonable. The price will not be reduced for:

(1) Moisture content;

(2) Damage due to uninsured causes; or

(3) Drying, handling, processing, or any other costs associated with normal harvesting, handling, and marketing of the rice; except, if the price of the damaged production can be increased by conditioning, we may reduce the price of the production after it has been conditioned by the cost of conditioning but not lower than the value of the production before conditioning,

(We may obtain prices from any buyer of our choice. If we obtain prices from one or more buyers located outside your local market area, we will reduce such prices by the additional costs required to deliver the rice to those buyers.);

(B) The value of the damaged or conditioned production will be divided by the local market price to determine the quality adjustment factor; and

(C) The number of pounds remaining after any reduction due to excessive moisture (the moisture-adjusted gross pounds (if appropriate)) of the damaged or conditioned production will then be multiplied by the quality adjustment factor to determine the net production to count.

(e) Any production harvested from plants growing in the insured crop may be counted as production of the insured crop on a weight basis.

**13. Prevented Planting.**

Your prevented planting coverage will be 45 percent of your revenue guarantee for timely planted acreage. You may increase your prevented planting coverage to a level specified in the actuarial documents by paying an additional premium.

03-RA RICE (09/24/02)

**Exhibit to Complaint Page 34**